Alison LEBER, et al., Plaintiffs,

v.

UNIVERSAL MUSIC AND VIDEO
DISTRIBUTION, INC., et al.,
Defendants.

No. 99–CV–4279–JPG.

United States District Court,
S.D. Illinois.

Sept. 24, 2002.

Scott A. Huber, Cutright & Cutright, Toledo, IL, Mervin Lee Wolfe, Attorney at Law, Toledo, IL, for Plaintiff.

Rebecca R. Jackson, Gregg M. Lemley, Bryan Cave, St. Louis, MO, for Universal Music and Video Distribution Inc.

Joseph S. Turner, Joshua L. Ditelberg, Seyfarth, Shaw, Chicago, IL, Rebecca A. Whittington, Attorney at Law, Carbondale, IL, for Panasonic Disc Services Corp.

### MEMORANDUM AND ORDER

GILBERT, District Judge.

This matter comes before the Court on the motions for summary judgment filed by defendants Matsushita Universal Media Services ("MUMS") (Doc. 62), Panasonic Disc Services Corporation ("Panasonic") (Doc. 70), and the International Leather Goods, Plastics, Novelty and Service Workers Union ("the International") (Doc. 82). The plaintiffs, International Leather Goods, Plastics, Novelty and Service Workers Union, Local 352 ("Local 352"), a member organization of the International, and 75 of Local 352's individual members or former members ("individual plaintiffs"), have responded to the motions (Docs. 65 & 66), and the defendants have filed their respective replies (Docs. 67, 73 & 76). The Court also considers the plaintiffs' response (Doc. 113) to the Court's order to show cause why their claims against Universal Music & Video Distribution, Inc. ("Universal") should not be dismissed pursuant to Federal Rule of Civil Procedure 4(m) for failure to effect service within 120 days after the filing of the complaint.

The plaintiffs bring this suit against Universal, MUMS and Panasonic pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185, for breach of a collective bargaining agreement. They have sued the International pursuant to

§ 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a), for breach of the duty of fair representation based on a violation of § 101(a)(1) of the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 411(a)(1).

## I. Summary Judgment Standard

Summary judgment is appropriate where "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed.R.Civ.P. 56(c); *see Celotex Corp. v. Catrett,* 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Spath v. Hayes Wheels Int'l–Ind., Inc.,* 211 F.3d 392, 396 (7th Cir.2000). The reviewing court must construe the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in favor of that party. *See Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 255, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Spath,* 211 F.3d at 396. Where the moving party fails to meet its strict burden of proof, a court cannot enter summary judgment for the moving party even if the opposing party fails to present relevant evidence in response to the motion. *Cooper v. Lane,* 969 F.2d 368, 371 (7th Cir.1992).

In responding to a summary judgment motion, the nonmoving party may not simply rest upon the allegations contained in the pleadings but must present specific facts to show that a genuine issue of material fact exists. Fed.R.Civ.P. 56(e); *Celotex,* 477 U.S. at 322–26, 106 S.Ct. 2548; *Johnson v. City of Fort Wayne,* 91 F.3d 922, 931 (7th Cir.1996). A genuine issue of material fact is not demonstrated by the mere existence of "some alleged factual dispute between the parties," *Anderson,* 477 U.S. at 247, 106 S.Ct. 2505, or by "some metaphysical doubt as to the material facts," *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986); *Michas v. Health Cost Controls of Ill., Inc.,* 209 F.3d 687, 692 (7th Cir.2000). Rather, a genuine issue of material fact exists only if "a fair-minded jury could return a verdict for the [nonmoving party] on the evidence presented." *Anderson,* 477 U.S. at 252, 106 S.Ct. 2505; *accord Michas,* 209 F.3d at 692.

## II. Facts

Viewed in the light most favorable to the plaintiffs, the admissible evidence establishes the following facts.[1]

### A. The Pinckneyville Plant

Prior to May 1999, Universal owned and operated a compact disc ("CD") manufac-

---

**1.** At some points in their statements of fact, the parties refer to lengthy exhibits without specific page or section citations. The plaintiffs are also guilty of citing to evidence without explaining it or its relation to the general conclusions for which it is offered in support, citing to evidence by Bates number without reference to the exhibit in which it is contained and citing to pages within exhibits that do not contain those pages. It is not the Court's function to "scour the record in search of evidence to defeat a motion for summary judgment." *Bombard v. Fort Wayne Newspapers, Inc.,* 92 F.3d 560, 562 (7th Cir. 1996). "Judges are not like pigs, hunting for truffles buried in briefs." *United States v. Dunkel,* 927 F.2d 955, 956 (7th Cir.1991). The same proposition holds true with respect to facts offered in support of or in opposition to a summary judgment motion. It is also not the Court's function to construct a party's argument for him. *Spath v. Hayes Wheels Int'l–Ind., Inc.,* 211 F.3d 392, 397 (7th Cir. 2000). Because on occasion the parties have not directed the Court to specific evidence or explained the significance of that evidence, the Court has not considered the inadequately cited or explained "facts" in determining whether a genuine issue of material fact exists for trial.

turing plant in Pinckneyville, Illinois. The workforce at the plant was composed of members of Local 352, and the International was their exclusive bargaining representative. The plant included manufacturing operations and a department to handle CDs and digital versatile discs ("DVDs") returned from customers ("returns department"). The individual plaintiffs worked in Universal's returns department. Their employment was governed by a 1996 collective bargaining agreement between Universal and the International ("1996 Universal CBA"). There were no other signatories to the 1996 Universal CBA. By its terms, the 1996 Universal CBA was effective from June 9, 1996, to June 9, 2001, and possibly longer.

As a result of a corporate reorganization following Universal's parent company's merger with PolyGram, Universal announced in January 1999 that it would be closing the Pinckneyville returns department.

### B. *The Joint Venture*

In late 1998, Universal and Panasonic began discussing the possibility of a joint venture to manufacture CDs and DVDs. Universal and Panasonic did not share any corporate parentage and were completely separate corporations. Panasonic wanted to establish a manufacturing operation closer to its customers and its warehouses in the eastern and midwestern United States than its manufacturing operations in California, which were operating at peak capacity at the time. Panasonic was also interested in a joint venture with Universal because it believed that the venture could spawn a long-term contract to supply DVDs or CDs to Universal, one of Panasonic's largest customers, and could give Panasonic access to lower cost raw materials. On the other side, Universal wanted to find additional uses for the Pinckney-

ville facility, which it believes would become underutilized after Universal's parent company's merger with PolyGram and the subsequent reorganization.

On April 15, 1999, Universal notified Local 352 and Rosemary Behrman ("Behrman"), general president of the International and the International's Midwest Joint Board and member of the International's General Executive Board, that, with the exception of the returns department, it would be selling its Pinckneyville operations. In a meeting held May 7, 1999, Local 352's Executive Board was told that the new owner refused to be bound by the 1996 Universal CBA but that it would accept the economic terms of the 1996 Universal CBA if some changes were allowed to the non-economic terms of the agreement. Otherwise, the new owner would "go non-union." Behrman did not inform the Local Executive Board of the specific changes the new owner wanted because she did not know what they were. The Local Executive Board authorized Behrman to accept a "language change" to the non-economic terms of 1996 Universal CBA in a new agreement with the new employer.

On May 13, 1999, in a letter agreement, Behrman agreed with Panasonic on behalf of the joint venture company, MUMS,[2] that MUMS would offer jobs to all of the employees working in Universal's manufacturing plant under modified terms and conditions. They also agreed that if a majority of the MUMS workforce had been represented by the International when they were employed at Universal, MUMS would recognize the International as the exclusive bargaining representative of its workforce as well. In return, the International agreed to enter into a new collective bargaining agreement with MUMS under non-economic terms that

---

**2.** At this point in the negotiations, MUMS was referred to as "New Company."

differed slightly from the 1996 Universal CBA. The agreement was clear that the returns department employees would not be offered MUMS employment, would not become employees of MUMS and would not be able to bump less senior Universal manufacturing department employees from their jobs at MUMS.

## C. *MUMS Goes On Line*

The joint venture became a reality on May 22, 1999, when Universal and Panasonic officially formed MUMS, a limited liability corporation. The joint venture documents signed by Universal and Panasonic contained the following provisions:

3.1 *Closing* The transfer of assets contemplated by this UMVD Contribution Agreement shall occur simultaneously with, and as part of, the Closing of the JV Agreement. At Closing, with respect to the [Universal] Contributed Assets:

\* \* \* \* \* \*

(b) [Universal] and [MUMS] shall enter into an assignment of the amended Union Contract. . . .

\* \* \* \* \* \*

5.4 *Employees.* [MUMS] shall offer employment following Closing to each Employee at the Pinckneyville Facility who is employed in the CD replication and packaging business of the Pinckneyville Facility at the Closing on substantially equivalent salary, wages and benefits . . . taken as a whole, as provided to such Employees by [Universal] prior to Closing. Employees involved in the distribution and returns business at the Pinckneyville Facility will not be employed by [MUMS] following Closing, and [MUMS] will have no liability or obligations with respect to such employees. . . .

5.5 *Union.*

\* \* \* \* \* \*

5.5.3 [Universal] will bargain in good faith with the Union concerning the "effects" of the assignment of the contract to [MUMS].

UMVD Contribution Agreement Among Matsushita Universal Media Services LLC of America and Universal Music and Video Distribution, Inc., Dated as of May 22, 1999.

The day after MUMS was formed, MUMS recognized the International as the exclusive bargaining representative of its workforce and, on behalf of the International, Behrman signed a collective bargaining agreement with MUMS ("1999 MUMS CBA"). She represented that she had the authority to sign the agreement on behalf of the International and purported to sign the agreement under the powers granted by the International's constitution, which states, in pertinent part, "The General Executive Board, shall also have the power, in cooperation with the Local Union, Joint Board or Council . . . to make contracts with employers." Constitution of the International Leather Goods, Plastics, Novelty and Service Workers Union art. VII, § 5. No provision of the International's constitution required ratification by the membership, but Local 352's constitution provided, "Proposed contracts shall be negotiated by a committee elected by the members of the shop affected and must be approved by a majority of the members of the shop attending a meeting and by the Executive Board of the Union." Constitution and By–Laws of International Plastic and Novelty Workers Union Local 352, AFL–CIO art. 12, § 2. By its terms, the 1999 MUMS CBA was effective from May 23, 1999, to June 9, 2001, and possibly longer. Neither Universal nor Panasonic was a party to the 1999 MUMS CBA.

As a part of the joint venture, Panasonic contributed $18 million in capital expenditures to enable DVD production and re-

ceived a 60% ownership interest in MUMS. It was therefore able to appoint a controlling majority of MUMS governing board. Universal, on the other hand, contributed assets and expenditures, including the Pinckneyville facility, valued at $12 million and received the remaining 40% ownership interest. As a minority shareholder, Universal did not control the operations at MUMS' manufacturing facility, although Gary Vaughn, Universal's senior director of operations at the Pinckneyville plant, and Michele Rheinecker, Universal's human resources manager at the Pinckneyville plant, were hired by MUMS in essentially the same capacities at the plant. Neither they nor any other MUMS officer reported to Universal. MUMS and Universal maintained separate business records, bank accounts, financial statements, sales forces, advertising and insurance. Universal paid its own bills and taxes in connection with the returns department.

MUMS acquired all of Universal's Pinckneyville buildings, including the building housing the returns department, but Universal retained ownership and control over the returns department operations. MUMS did not have and did not need a returns department. As promised in the May 13, 1999, letter agreement, MUMS offered employment to Universal's manufacturing operations employees under the 1999 MUMS CBA. However, shortly after it began operating, MUMS needed additional workers for DVD manufacturing jobs and accepted applications for those jobs from Universal returns department employees. MUMS ultimately hired some of those workers, including some of the individual plaintiffs, under the terms of the 1999 MUMS CBA. The individual plaintiffs who were not hired by MUMS continued to work in Universal's returns department under the terms of the 1996 Universal CBA. MUMS and Universal never employed the same workers at the same time.

Universal's returns department employees were supervised by one or two Universal site managers. However, MUMS performed human resources and other administrative functions for Universal's returns department employees pursuant to a contract with Universal. Thus, the time clock for returns department employees was kept in the MUMS facility, as were other payroll and human resources records. MUMS employees sent out Universal paychecks using MUMS envelopes, monitored and administered discipline for returns department absenteeism and implemented the garnishment of returns department employee wages as appropriate. Other than keeping human resource records and other administrative functions, MUMS had no authority or control over the terms of employment of the Universal employees in the returns department. In connection to one Universal employee's grievance, a settlement document prepared by a Universal attorney purported to settle with MUMS and Universal and contained only one signature line. The Universal attorney did not have authority to settle claims involving MUMS.

Despite the mostly separate management of the companies, there was some slight overlap. One Universal employee unloaded trucks and drove a forklift at the MUMS facility three times. On at least one occasion, MUMS employees ran a machine in the returns department building. MUMS also assisted the returns department in some shipping functions such as creating invoices and shipping paperwork, brought over Universal deliveries that had been mistakenly delivered to MUMS, and delivered shipments from MUMS to Universal at the returns department. MUMS and the returns department also shipped boxes, supplies and merchandise to each other without the standard shipping paperwork.

Using MUMS employees, MUMS maintained the building in which the returns department was housed as well as the equipment and property in the returns department, including the computers and machinery that it had purchased from Universal. MUMS charged Universal for maintaining the returns department building.

MUMS now manufactures CDs and DVDs. Manufacturing DVDs requires different, additional manufacturing equipment and worker skills than manufacturing CDs. MUMS sells more than half of the DVDs to Panasonic, which had not been a Universal customer prior to MUMS' formation. MUMS also intends to expand its Pinckneyville manufacturing facility and currently employs at least as many manufacturing workers as Universal did in its CD-only manufacturing operations. As a consequence of new manufacturing jobs created since MUMS was originally formed, MUMS received tax incentives from the state of Illinois' Economic Development for a Growing Economy ("EDGE") program, which had been passed by the Illinois legislature four days prior to MUMS' formation. From May 1999 until the 1999 MUMS CBA's termination date, MUMS, its employees and the International observed the 1999 MUMS CBA.

## D. *Internal Union Matters*

On another front, the International was encountering problems with its own internal governance. During the relevant time periods, the International was affiliated with the Service Employees International Union AFL–CIO, CLC ("SEIU"). On July 11, 1999, the SEIU placed the International's Midwest Joint Board into trusteeship, removed all officers of the Midwest Joint Board, including Behrman, and appointed Bruce Boyens ("Boyens") as one of its deputy trustees.[3] Several weeks later, Boyens instructed Local 352 and other local unions within the Midwest Joint Board that he alone was their legal representative.

## E. *Close Of Returns Department*

On July 15, 1999, Universal informed Local 352 that because of the planned closing of the returns department, the 184 Local 352 members working in the returns department would be laid off beginning on September 17, 1999. Subsequently, some of the plaintiffs filed grievances under the 1996 Universal CBA on behalf of Local 352 members regarding MUMS' opening. Some were filed with MUMS and others were filed with Universal. When MUMS received grievances from Universal employees purportedly under the 1996 Universal CBA, it referred them to Universal. Pursuing the grievances, the International met with Universal to discuss the closing and with MUMS to discuss future employment of its members. The grievants were not included in the meetings although the 1996 Universal CBA provides that they will attend Step 3 of the grievance process. On September 7, 1999, MUMS signed an agreement ("Side Letter Agreement") with Boyens on behalf of the International. In the Side Letter Agreement, MUMS agreed to give a hiring preference to Universal's returns department employees and to allow those employees to keep certain vacation benefits. In light of the Side Letter Agreement, the International did not pursue the grievances further. The

---

**3.** At some point after the 1999 MUMS CBA became effective, the International became known as SEIU Local 2000, the Midwest Joint Board became known as SEIU Local 1001, and the Local became known as Chapter 352 of SEIU Local 2000. For clarity's sake, the Court will continue to refer to the organizations by their names prior to the name change.

returns department employees were, in fact, laid off in September and October 1999. The individual plaintiffs are 75 of those laid off.

## III. The Litigation

The plaintiffs filed this lawsuit on November 23, 1999, alleging that MUMS and Panasonic either (1) are the alter egos of Universal, (2) are a single or joint employer with Universal or (3) assumed the obligations of the 1996 Universal CBA by virtue of the joint venture agreements, and are therefore bound by the 1996 Universal CBA. They claim that MUMS and Panasonic breached the 1996 Universal CBA when they (1) denied laid off returns department employees the right to claim jobs at MUMS, (2) laid off returns department employees when other jobs at MUMS were available, (3) coerced employees into reopening the 1996 Universal CBA, (4) attempted to ratify the resulting new terms without a vote by Local 352, (4) failed to follow the proper grievance procedure regarding the aforementioned breaches, and (5) violated §§ 12.02, 14.03 16.07 & 17.02 of the 1996 Universal CBA. They bring these claims pursuant to § 301 of the Labor Management Relations Act, 29 U.S.C. § 185.[4]

The plaintiffs also sued the International under Section 9(a) of the National Labor Relations Act, 29 U.S.C. § 159(a), based on an alleged violation of § 101(a)(1) of the Labor Management Reporting and Disclosure Act, 29 U.S.C. § 411(a)(1). They allege that the International breached its duty of fair representation when it (1) failed to grieve Panasonic's refusal to abide by the 1996 Universal CBA, (2) recommended to the Local Executive Board that Behrman be allowed to accept a collective bargaining agreement with MUMS

that was the same as the 1996 Universal CBA except for some changes to non-economic terms without finding out or telling the Local Executive Board what those changes would be and (3) executed the 1999 MUMS CBA without disclosing its terms to or seeking ratification from Local 352.

MUMS and Panasonic argue in their motions for summary judgment that they cannot be held liable for breaching the 1996 Universal CBA because they were not parties to that agreement and are not alter egos of or single/joint employers with Universal. They also argue that, even if they were bound by the 1996 Universal CBA, there was no breach and that, even if there was a breach, all disputes over the breach were settled with the International.

The International argues in its motion for summary judgment that the plaintiffs' claim cannot succeed because they cannot prevail in their breach of contract claims against MUMS or Panasonic, a prerequisite for prevailing in a hybrid suit for the breach of the duty of fair representation against the International. It also argues that its actions were not arbitrary, discriminatory or in bad faith and that the plaintiffs suffered no damage from its actions.

The plaintiffs' response to the motions is a hodge-podge of factual assertions, legal conclusions and legal rules with very little analysis or organization. To the extent it understands them, the Court will attempt to address each of the plaintiffs' liability theories in turn.

## IV. MUMS' and Panasonic's Liability under the 1996 Universal CBA

It is beyond question that neither MUMS nor Panasonic is a signatory to the

---

4. One local union member, Bonnie Hampsey, also brought an age discrimination claim under the Age Discrimination in Employment Act, 29 U.S.C. §§ 621 *et seq.*, based on her termination. The Court has dismissed that claim.

1996 Universal CBA. Therefore, they are not bound to that agreement by virtue of a signature. The Court therefore must determine whether MUMS or Panasonic is bound by the 1996 Universal CBA by virtue of their being successors to Universal's business or by virtue of other legal theories which can bind a non-signatory to a collective bargaining agreement. For the following reasons, the Court finds that no reasonable jury could find that MUMS or Panasonic were bound by the 1996 Universal CBA.

### A. *Joint Venturers*

■ Neither MUMS nor Panasonic is bound by the 1996 Universal CBA as a partner or joint venturer with Universal. The plaintiffs claim that MUMS and Panasonic are liable under the 1996 Universal CBA because MUMS and Panasonic are joint venturers with Universal and are therefore liable as partners for Universal's liabilities relating to the joint venture.

The plaintiffs are wrong. It is true that Universal and Panasonic called MUMS a joint venture before MUMS was formed, and indeed in the planning stage Universal and Panasonic might have been joint venturers. The plaintiffs ignore, however, the clear fact that after its creation MUMS became a *limited liability company* under the Delaware Limited Liability Company Act, a wholly different animal than a joint venture or partnership. *See generally* Del.Code Ann. tit. 8, § 18–101 *et seq.* Members of a Delaware limited liability company are not governed by partnership principles and are not obligated for the contractual liabilities of the limited liability company. *See* Del.Code Ann. tit. 6, § 18–303 (2002). The plaintiffs have cited no authority, other than those discussed and rejected below, for the assertion that a limited liability company such as MUMS is liable for the contractual obligations of its corporate members or that a fellow limited liability company member such as Pana-

sonic is liable for the contractual obligations of another member.

Even if Universal and Panasonic could be considered to be joint venturers prior to MUMS' formation, they would only be liable for each other's acts within the scope of the joint venture. *Donohoe v. Consolidated Operating & Production Corp.*, 982 F.2d 1130, 1139 (7th Cir.1992) (Illinois law); *Hudson v. A.C. & S. Co.*, 535 A.2d 1361, 1363 (Del.Super.Ct.1987) (Delaware law). Universal's relations with its workforce in its own business were beyond the scope of any joint venture it might have had with Panasonic. Those relations are memorialized in a collective bargaining agreement executed in 1996, years before Panasonic came into the picture. When it did arrive on the scene, Panasonic played no part in Universal's continuing relations with the plaintiffs in this case. At all relevant times in this case, they were employed by Universal and governed by the 1996 Universal CBA. Universal's continuing relations with the plaintiffs were beyond the scope of any joint venture or partnership with Panasonic.

For these reasons, the Court finds that no reasonable jury could find MUMS or Panasonic liable under a joint venture theory for the obligations of Universal under the 1996 Universal CBA.

### B. *Successor Liability*

■ Neither MUMS nor Panasonic is bound by the 1996 Universal CBA simply because it is a successor to Universal's Pinckneyville manufacturing or returns business. Although a successor corporation may be bound to bargain with the union of the workforce of the predecessor corporation, generally it is not bound by the substantive terms of the predecessor corporation's collective bargaining agreement unless it agreed, either explicitly or implicitly, to assume those obligations.

*NLRB v. Burns Int'l Sec. Servs.*, 406 U.S. 272, 285, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972); *see also Fall River Dyeing & Finishing Corp. v. NLRB*, 482 U.S. 27, 41, 43, 107 S.Ct. 2225, 96 L.Ed.2d 22 (1987) (successor has obligation to bargain with predecessor's employees' union if there is "substantial continuity" between the businesses and the successor hires most of its employees from the predecessor).[5] This is because, with respect to the obligation to bargain, a mere change in ownership or management does not affect the force of a National Labor Relations Board's certification of a bargaining unit representative if a majority of the employees of the successor were employed by the predecessor. *Burns*, 406 U.S. at 279, 92 S.Ct. 1571. However, with respect to substantive contract commitments, a successor is free to set the new terms upon which it will hire a predecessor's employees and is not bound by the substantive terms of the predecessor's collective bargaining agreement. *Id.* at 284, 294, 92 S.Ct. 1571.

A potential employer may be willing to take over a moribund business only if he can make changes in corporate structure, composition of the labor force, work location, task assignment, and nature of supervision. Saddling such an employer with the terms and conditions of employment contained in the old collective-bargaining contract may make these changes impossible and may dis-

courage and inhibit the transfer of capital. On the other hand, a union may have made concessions to a small or failing employer that it would be unwilling to make to a large or economically successful firm.

*Id.* at 287–88, 92 S.Ct. 1571.

Thus rule of successorship may hold true even if the successor is wholly owned by the predecessor or if the successor and predecessor share a common corporate parent. *International Oil, Chemical & Atomic Workers, Local 7–517 v. Uno–Ven Co.*, 170 F.3d 779, 781 (7th Cir.1999). This is true because the federal common law applicable in breach of labor contract cases respects the principles of corporate separateness regardless of common ownership. *Id.* at 781. Thus, a successor is not bound by the contracts of an affiliated predecessor

provided that each corporation complies with the formalities required by corporation law; that the splitting of the overall enterprise into separate corporations does not have an improper purpose, such as to mislead creditors or otherwise avoid contractual obligations or to defeat taxation or regulation; that the unlawful act was not authored by a corporate affiliate, in which event that affiliate as the unlawful actor would be a proper defendant; and that the affiliate did not assume by assignment or otherwise the

---

**5.** One major exception to this general rule is for arbitration clauses, which are viewed through the national policy of encouraging resolution of labor disputes through arbitration. A successor corporation that has "substantial continuity of identity in the business enterprise" of the predecessor corporation may be bound by the predecessor's agreement to arbitrate. *See John Wiley & Sons v. Livingston*, 376 U.S. 543, 551, 84 S.Ct. 909, 11 L.Ed.2d 898 (1964) (successor bound by arbitration clause where predecessor disappeared after merging into successor in state where successor corporation assumed by law obli-

gations of merged predecessor corporation and where successor hired all of predecessor's employees); *compare Howard Johnson Co. v. Detroit Local Joint Executive Board*, 417 U.S. 249, 262, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974) (successor not bound by arbitration clause where predecessor remained in existence and successor hired only small portion of its workforce from predecessor's workforce). Another exception to the successorship rule is for corporate acquisitions by mere stock purchases. *See Esmark, Inc. v. NLRB*, 887 F.2d 739, 751 (7th Cir.1989). Neither exception is relevant to this case.

contractual obligation that the union is suing to enforce. *Id.*

*Atomic Workers* discusses a hypothetical analogous to the case at bar: a corporation that sells its assets to a subsidiary who continues the business operation. *Id.* The Court of Appeals noted that the predecessor, parent corporation would still be bound by its collective bargaining agreement *if* it continued to manage labor relations with the successor's workforce. *Id.* at 782. However, by the same token, a predecessor who relinquishes control over labor relations to an affiliated successor will not cause the successor to be bound by the predecessor's collective bargaining agreement unless the aforementioned exceptions apply. *Id.* at 783.

Panasonic is not a successor to Universal in any sense of the word. It did not acquire its assets, its workforce or its business. Without having any continuity whatsoever with Universal's business, it cannot be deemed a successor and it cannot have acquired any liability under the 1996 Universal CBA via successorship.

MUMS, however, is a more complicated question. The Court will first examine whether MUMS succeeded to Universal's returns department business, then whether MUMS succeeded to Universal's manufacturing business.

*Returns Department Business:* MUMS is a successor to Universal's returns department business in the sense that it became the new owner of the building and the equipment used in that business. The plaintiffs believe that MUMS also succeeded to Universal's returns department business operations such that the *Burns* successorship rule would become applicable.[6] In support of its position, the plaintiffs point to the Side Letter Agreement in which MUMS agreed to give hiring preferences to former Universal employees as an example of how MUMS ran the returns department business. However, MUMS' negotiation with the International—which represented returns department *and* MUMS employees—and its subsequent decision to search for new employees while at the same time trying to quell complaints from the International about the returns department closure, whether meritorious or not, in no way demonstrates that MUMS ran or controlled the returns department business after it purchased the returns department building.

The plaintiffs also point to the administrative personnel functions, such as monitoring absences and time clocks, administering wage garnishments, maintaining personnel files and mailing paychecks, that were performed by MUMS pursuant to a contract with Universal. Once again, this evidence does not show that MUMS controlled the returns department's business operation, only that it performed its contractual obligations to Universal. In fact, the evidence overwhelmingly shows that Universal continued to run the returns department and to supervise and manage labor relations with returns department employees without substantive involvement of MUMS.

There is no evidence that MUMS succeeded to the returns department business itself. In fact, all the evidence indicates that there was no continuity of operations between Universal and MUMS with respect to the returns business. Universal's returns business was, and continued to be after MUMS purchased the facility, concerned with disposing of returned CDs and DVDs. MUMS, on the other hand, became merely a landlord. No party can seriously contend that there is any continuity be-

6. If this were so, even under the *Burns* successorship rule, MUMS would have been free to repudiate the terms of the 1996 Universal CBA.

tween disposing of media products and being a landlord. If this were the case, labor forces would be required to negotiate with a new "employer" every time a building housing the workforce changed hands. This would be absurd. For this reason, the Court finds that MUMS did not succeed to Universal's returns department business and was therefore not obligated to observe the 1996 Universal CBA or to bargain with the International concerning the returns department.

*Manufacturing Business:* MUMS concedes that it is a successor to Universal's manufacturing operations because MUMS purchased Universal's manufacturing plant assets and continued with its CD manufacturing business, although it added the DVD manufacturing operation. Therefore, under *Burns,* even if MUMS' manufacturing operations had "substantial continuity" with Universal's manufacturing operations, which the Court assumes at this point without deciding, it would only be bound to bargain with the workforce's exclusive bargaining representative. It would not be bound by the terms of the 1996 Universal CBA. MUMS' status as a successor to Universal's manufacturing business is simply not enough by itself to warrant binding it to the 1996 Universal CBA.

The plaintiffs argue that the *Burns* successorship rule should not apply and that MUMS should be bound by the 1996 Universal CBA because Universal and MUMS should not be viewed as separate corporations. Relying on *Atomic Workers,* Local 352 argues that Universal controls MUMS' labor relations, that MUMS was created for the improper purpose of taking advantage of the Illinois EDGE program and that MUMS assumed the 1996 Universal CBA.

### 1. *Control of Labor Relations*

There is no evidence from which a reasonable jury could conclude that Universal controlled labor relations at the Pinckneyville manufacturing plant after MUMS was created. Affidavit testimony establishes that Universal had no authority over employment-related matters at MUMS or over negotiations of the 1999 MUMS CBA.

Again, the plaintiffs point to the Side Letter Agreement and MUMS' performance of administrative personnel functions for Universal, both of which the Court discussed above. Neither the Side Agreement nor the personnel assistance demonstrates that Universal managed labor relations for MUMS at the manufacturing plant. Thus, these facts provide no basis to find that Universal continued to manage the Pinckneyville manufacturing plant's labor relations after MUMS' creation.

The plaintiffs also argue that the attempt by a Universal attorney to settle claims by a Universal returns department employee against MUMS and Universal using a settlement agreement with one signature line for the "employer" is proof positive that the labor relations of MUMS and Universal are intimately intertwined. The plaintiffs overlook the fact that the drafting attorney testified that he did not represent MUMS or have the authority to prepare an agreement settling claims against MUMS. The Court believes that an unexecuted settlement agreement that the drafting attorney admits he did not have authority to prepare is not evidence that Universal controlled labor relations at the Pinckneyville manufacturing plant after MUMS' creation.

Although not raised by the plaintiffs, the Court also notes that MUMS and Universal maintained separate grievance procedures. Accordingly, without taking any action, MUMS referred grievances from

Universal employees to Universal for resolution. In light of the foregoing evidence, the Court believes that no reasonable jury could find that Universal controlled labor relations at the Pinckneyville manufacturing facility after MUMS' creation or that MUMS, by virtue of Universal control, was bound by the 1996 Universal CBA.

### 2. *Improper Purpose*

The plaintiffs also believe that the structure and timing of the MUMS transaction to take advantage of tax benefits under the Illinois EDGE program was fraudulent. This is absurd. The evidence shows that Universal and Panasonic had legitimate business reasons for wanting to create MUMS. They did not seek to avoid dealing with the International by such a plan, for MUMS immediately signed the 1999 MUMS CBA after it was created. Furthermore, by its very nature, the EDGE program's tax incentives were designed to influence corporations to create jobs in Illinois. This was a legitimate consideration for the MUMS project. In fact, the plaintiffs admit in their brief that the EDGE incentives worked: "MUMS would not have been formed in Illinois but for the availability of the Edge [sic] program." Pl. Mem. at 45. That Universal and Panasonic created MUMS in Illinois to avoid a potential shut-down of the Pinckneyville plant, and in doing so did not attempt to dodge an obligation to bargain with the International, and that the MUMS formation was timed so that MUMS could take advantage of EDGE tax incentives reflects shrewd business judgment, not fraud, and demonstrates the effectiveness of the EDGE program. No reasonable jury could find otherwise.

### 3. *Assumption of the 1996 Universal CBA*

In support of their argument that MUMS assumed the 1996 Universal CBA, the plaintiffs point to language in the joint venture documents evidencing an intent to assign the 1996 Universal CBA as amended. They also argue that Panasonic's attorney's negotiation with Behrman for the May 13, 1999, letter was, in fact, carrying out Universal's promise in the May 22, 1999, joint venture documents to renegotiate a labor contract with the International. Panasonic's assumption of this duty, the plaintiffs argue, manifests an assumption of the 1996 Universal CBA.

Aside from the obvious timing problems presented by allegations of fulfilling a promise before it was made, the Court finds that the joint venture agreements do not manifest an intent to assign or assume the 1996 Universal CBA. Although they use the term "assign," it is clear from the joint venture documents as a whole that the parties did not mean to "assign" the 1996 Universal CBA as that term is used as a legal term of art. First, the mention of the union contract is, with one exception, modified by the term "amended," which indicates that MUMS did not intend to assume the 1996 Universal CBA as it existed at the time. Second, it is clear from § 5.4 that MUMS intended to make new offers of employment to workers at the Pinckneyville manufacturing plant but with some changes to their employment terms. It is equally clear that MUMS intended to have no contractual obligation to any Universal returns department employee. This is hardly language manifesting an intent to assume contractual obligations to returns department employees. On the contrary, the evidence can only lead to the conclusion that, although Universal promised to renegotiate terms with the International to be implemented at the MUMS manufacturing facility, that promise was unnecessary because on May 22, 1999, Panasonic had already established labor relations with the International on behalf of MUMS and had already negotiated the terms of the 1999 MUMS CBA. The

Court is convinced that no reasonable jury could find that the joint venture documents, when read as a whole, manifested an intent to assume or assign the 1996 Universal CBA.

In sum, a reasonable jury could not find that MUMS or Panasonic succeeded to Universal's returns department operations and that, with respect to Universal's manufacturing operations, the rule of successorship set forth in *Burns* applies to MUMS. Therefore neither MUMS nor Panasonic is bound by the terms of the 1996 Universal CBA with respect to any of the Pinckneyville operations. The Court now turns to other theories under which one company can be liable for the collective bargaining agreements of another. Although these theories overlap to some degree with the exceptions to the successorship rule discussed above, they are significant enough as independent theories to warrant separate discussion.

### C. *Alter Ego Theory*

Neither MUMS nor Panasonic is bound by the 1996 Universal CBA on the grounds that it is Universal's alter ego. A company may be liable under the collective bargaining agreement of another company if the company is its alter ego. *See International Union of Operating Eng'rs, Local 150 v. Rabine,* 161 F.3d 427, 433 (7th Cir. 1998); *see also Howard Johnson Co. v. Detroit Local Joint Executive Board,* 417 U.S. 249, 259 n. 5, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974). To be an alter ego, the second company must be a "disguised continuance" of the first company that results in an evasion of the first company's labor obligations. *Trustees of Pension, Welfare & Vacation Fringe Benefit Funds of IBEW, Local 701 v. Favia Elec. Co.,* 995 F.2d 785, 788–89 (7th Cir.1993); *see Howard Johnson,* 417 U.S. at 259 n. 5, 94 S.Ct. 2236; *Rabine,* 161 F.3d at 433. To determine if companies are alter egos, the

Court should consider the following relevant factors:

(1) substantially identical ownership and/or control; (2) substantially identical management including control of labor relations; (3) identical and unchanged business operations including purpose, facilities, equipment, customers and supervision; and (4) unlawful motivation. *NLRB v. Dane County Dairy,* 795 F.2d 1313, 1322 (7th Cir.1986); *see Rabine,* 161 F.3d at 433.

The evidence presented clearly shows that neither MUMS nor Panasonic is Universal's alter ego.

#### 1. *Substantially Identical Ownership and/or Control*

MUMS and Panasonic both have substantially different ownership and control than Universal has. Universal owns only 40% of MUMS. Panasonic owns the remaining 60% and, by virtue of its majority ownership, appoints a controlling majority of MUMS' governing board. Thus, Universal did not have control over MUMS.

As for Panasonic, it does not share any corporate parents with Universal, and there is no evidence that either controls the other. Therefore, they clearly do not have identical ownership or control.

#### 2. *Substantially Identical Management and Labor Relations*

MUMS' and Universal's management and labor relations are not so interconnected as to support the finding that they are alter egos. It is true that MUMS' chief operating officer Gary Vaughn and human resources manager Michele Rheinecker used to hold virtually the same positions when Universal owned the Pinckneyville manufacturing facility. However, with the exception of contracted human resources work, neither of those employees managed or supervised Universal employees or re-

ported to Universal after they began working for MUMS. In fact, no MUMS officer reported to Universal. Universal supervisors continued to oversee and manage Universal employees in the returns department after MUMS was created, and MUMS and Universal had no common employees.

With respect to labor relations, as noted in the Court's discussion of successor liability, there is no evidence from which a reasonable jury could determine that Universal controlled MUMS' labor relations or vice versa.

As for Panasonic, Universal and Panasonic do not have substantially identical management or labor relations. There is no common or cross-management between the two companies, and each conducts its own labor relations. As discussed earlier, Panasonic's negotiation of the 1999 MUMS CBA on behalf of MUMS before MUMS was actually created does not demonstrate any shared management or labor relations with Universal. No jury could find that this factor weighs in favor of alter ego status.

### 3. *Identical Business Operations*

Although similar, MUMS' and Universal's business operations at the Pinckneyville manufacturing facility are not identical. It is true that under both owners, the Pinckneyville manufacturing facility produced CDs. However, under MUMS' ownership, the facility also produces DVDs, which requires different, additional manufacturing equipment and worker skills. It sells more than half of the DVDs to Panasonic, who had not been a Universal customer prior to MUMS' formation. In addition, as all parties are acutely aware, MUMS does not have a returns department like Universal did. Furthermore, MUMS and Universal maintain separate business records, bank accounts, financial statements, sales forces, advertising and insurance, and Universal pays its own bills and taxes in connection with the returns department.

There is evidence that one Universal employee unloaded trucks and drove a forklift at MUMS three times, that MUMS employees ran a machine in the Universal facility at least one time, that MUMS employees helped prepare Universal shipping paperwork and that MUMS and Universal delivered boxes to each other without the standard paperwork. However, there is nothing to suggest that these occasions were not isolated or that they rose to the level of actually integrating business operations such that MUMS was a "disguised continuance" of Universal.

The plaintiffs do not discuss Panasonic's business operations and therefore cannot possibly be contending that Panasonic and Universal have identical business operations.

### 4. *Unlawful Motivation*

There is no evidence that MUMS' creation was motivated by any unlawful purpose. Both Panasonic and Universal have set forth legitimate business reasons for entering into the joint venture. As discussed above, taking advantage of the Illinois EDGE program when MUMS was formed was certainly a legitimate business objective. Furthermore, the fact that MUMS, through Panasonic, had agreed to enter into a collective bargaining agreement similar to the 1996 Universal CBA even before it was technically formed, and indeed did so the day after it was formed, belies any suggestion that MUMS was attempting to avoid its obligations under labor law. The plaintiffs have not alleged any other improper motivation for MUMS' formation, and the Court cannot think of any on its own.

In light of the foregoing, the Court finds that the evidence leaning against finding

that MUMS was Universal's alter ego so outweighs the slight evidence that MUMS was a "disguised continuance" of Universal that no reasonable jury could find that MUMS is Universal's alter ego. As for Panasonic, there is no evidence at all that it was Universal's alter ego. For this reason, neither MUMS nor Panasonic was bound by the 1996 Universal CBA as an alter ego of Universal.

### D. Single Employer

 Neither MUMS nor Panasonic is bound by the 1996 Universal CBA under the theory that it is a single employer with Universal. Where two companies are nominally separate business enterprises but where in reality they comprise an integrated enterprise, one may be held liable for the labor obligations of the other. See Trustees of Pension, Welfare & Vacation Fringe Benefit Funds of IBEW, Local 701 v. Favia Elec. Co., 995 F.2d 785, 788 (7th Cir.1993). The relevant factors to consider in the single employer inquiry are similar to those in the alter ego inquiry: interrelation of operations, management, labor relations and ownership. Id.; Esmark, Inc. v. NLRB, 887 F.2d 739, 753 (7th Cir.1989) (citing Radio Broadcast Technicians Local 1264 v. Broadcast Serv. of Mobile, Inc., 380 U.S. 255, 256, 85 S.Ct. 876, 13 L.Ed.2d 789 (1965)). The Court has already discussed the relevant factors in its alter ego analysis and has found that, although there is evidence of minimal interrelation of MUMS' and Universal's operations, in combination the factors do not weigh in favor of finding that MUMS and Universal are intimately interrelated. Therefore, the Court is convinced that no reasonable jury could find MUMS or Pa-

nasonic is a single employer with Universal.

### E. Joint Employer

 Neither MUMS nor Panasonic is bound by the 1996 Universal CBA by virtue of its being a joint employer with Universal. Corporations are joint employers if they exert significant control over the same employees. Teamsters Local Unions Nos. 75 & 200 v. Barry Trucking, Inc., 176 F.3d 1004, 1008 (7th Cir.1999); DiMucci Constr. Co. v. NLRB, 24 F.3d 949, 952 (7th Cir.1994); NLRB v. Western Temp. Servs., Inc., 821 F.2d 1258, 1266 (7th Cir.1987).[7] The relevant factors to be considered in the joint employer inquiry are "(1) supervision of employees' day-to-day activities; (2) authority to hire or fire employees; (3) promulgation of work rules and conditions of employment; (4) issuance of work assignments; and (5) issuance of operating instructions." DiMucci, 24 F.3d at 952; accord Barry Trucking, 176 F.3d at 1008. Joint employer status questions often arise in construction cases where a construction site owner or general contractor has the authority to dictate certain terms of its subcontractors' employees' employment. See generally DiMucci Constr. Co., 24 F.3d at 952–54.

The evidence before the Court demonstrates that Universal did not supervise MUMS or Panasonic employees, set their work rules or conditions of employment, issue their work assignments or issue operating instructions and that Universal did not have the authority to hire or fire MUMS or Panasonic employees. Likewise, neither MUMS nor Panasonic did any of these things for Universal employ-

---

7. Some courts have merged the single employer and joint employers theories. See, e.g., Sheetmetal Workers Union Local No. 110 v. Public Service Co., 771 F.2d 1071, 1074 (7th Cir.1985). DiMucci and Western Temporary Services acknowledge this confusion and clearly distinguish the theories. DiMucci Constr. Co., 24 F.3d at 953; Western Temp. Servs., 821 F.2d at 1266.

ees. In the absence of any evidence of cross-supervision, the evidence that on occasion a MUMS employee performed work in the Universal returns department or that a Universal employee performed work at the MUMS manufacturing facility is not sufficient to show that one exerted significant control over the other's employees. In sum, there is no basis whatsoever for a reasonable jury to find that Universal and MUMS or Panasonic were joint employers.

### F. Conclusion

For the foregoing reasons, the Court finds that no reasonable jury could find that MUMS or Panasonic was bound by the 1996 Universal CBA and that therefore MUMS and Panasonic are entitled to judgment as a matter of law. Accordingly, the Court need not reach the additional issues presented in the motions for summary judgment and will grant MUMS' and Panasonic's motions for summary judgment (Docs. 62 & 70).

### V. The International's Duty of Fair Representation

To recap, the plaintiffs claim that the International has breached its duty of fair representation by (1) failing to grieve Panasonic's refusal to abide by the 1996 Universal CBA, (2) recommending to the Local Executive Board that Behrman be allowed to accept a collective bargaining agreement with MUMS that was the same as the 1996 Universal CBA except for some changes to non-economic terms without finding out or telling the Local Executive Board what those changes would be and (3) executing the 1999 MUMS CBA without disclosing its terms to or seeking ratification from Local 352.

The International argues that the plaintiffs cannot succeed on their claims brought under § 301 of the Labor Management Relations Act because they cannot prevail in their claims against MUMS or Panasonic, a prerequisite for prevailing

in a suit for the breach of the duty of fair representation against the International. It also argues that its actions were not arbitrary, discriminatory or in bad faith considering the circumstances in which it found itself and that the plaintiffs suffered no damage from its actions.

An employee may bring a claim for breach of the duty of fair representation for a union's conduct in pursuing a grievance or for negotiating a collective bargaining agreement. *See, e.g., Vaca v. Sipes,* 386 U.S. 171, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967) (grievance); *Filippo v. Northern Ind. Pub. Serv. Corp.,* 141 F.3d 744 (7th Cir.1998) (grievance); *Ford Motor Co. v. Huffman,* 345 U.S. 330, 73 S.Ct. 681, 97 L.Ed. 1048 (1953) (contract negotiations); *Wegscheid v. Local Union 2911, United Auto. Workers,* 117 F.3d 986 (7th Cir.1997) (contract negotiations). A union violates its duty of fair representation when its conduct was arbitrary, discriminatory or in bad faith. *Air Line Pilots Ass'n, Int'l v. O'Neill,* 499 U.S. 65, 67, 111 S.Ct. 1127, 113 L.Ed.2d 51 (1991); *Vaca v. Sipes,* 386 U.S. 171, 190, 87 S.Ct. 903, 17 L.Ed.2d 842 (1967); *Filippo,* 141 F.3d at 748.

The arbitrariness inquiry is objective. If there is any rational reason for the union's conduct, it cannot be found to be arbitrary. *Filippo,* 141 F.3d at 748 (citing *O'Neill,* 499 U.S. at 67, 111 S.Ct. 1127). In the collective bargaining context, "[a] wide range of reasonableness must be allowed a statutory bargaining representative in serving the unit it represents, subject always to complete good faith and honesty of purpose in the exercise of its discretion." *Ford Motor Co. v. Huffman,* 345 U.S. 330, 337–38, 73 S.Ct. 681, 97 L.Ed. 1048 (1953). These principles hold true even if the end result of the union's conduct is ultimately unfavorable to an individual employee or the union as a

whole or favors a majority over a minority of the bargaining unit members. *O'Neill,* 499 U.S. at 79, 111 S.Ct. 1127; *see generally Trnka v. Local Union No. 688, United Auto. Workers,* 30 F.3d 60 (7th Cir.1994); *Dwyer v. Climatrol Indus., Inc.,* 544 F.2d 307 (7th Cir.1976). The union's decisions must be judged based on the circumstances when it made its decisions, not in hindsight. *O'Neill,* 499 U.S. at 67, 111 S.Ct. 1127.

On the other hand, the bad faith determination requires inquiry into the subjective motivation behind a union's conduct. *Id.* at 74–75, 111 S.Ct. 1127.

The Court will now address in turn each of the union's alleged breaches of the duty of fair representation.

### A. *Failure to Grieve Panasonic's Refusal to Abide by the 1996 Universal CBA*

The plaintiffs assert that the International should have grieved Panasonic's refusal (1) to recognize and abide by the 1996 Universal CBA, (2) to negotiate with the union to modify the 1996 Universal CBA and (3) to disclose the new terms and conditions it would demand in a new collective bargaining agreement. They also assert that the International should have grieved Panasonic's demand for "language changes" to the 1996 Universal CBA and threat to "go nonunion." The Court assumes that the plaintiffs' complaints include the International's decision not to pursue some plaintiffs' grievances to arbitration, although those issues were not pled in the complaint.

■■■ To the extent that the plaintiffs have pled § 301 claims against the International in a hybrid suit for Panasonic's breach of the 1996 Universal CBA, the Court can dispose of them in short order. Those claims against the International are not viable because the plaintiffs' claims against MUMS and Panasonic have failed

(See Part IV of this order), and the plaintiffs have not pursued any claims against Universal (see Part VI of this order). In suits for breach of a collective bargaining agreement that include claims that a union violated its duty of fair representation, an "employee's claim against the union and his claim against the employer are interlocked: neither claim is viable if the other fails." *Crider v. Spectrulite Consortium, Inc.,* 130 F.3d 1238, 1241 (7th Cir.1997). To the extent that the plaintiffs claim that they were harmed because the International did not grieve or pursue to arbitration Panasonic's alleged failure to abide by the 1996 Universal CBA, those claims must fail because the plaintiffs claims for breach of that collective bargaining agreement have failed.

■■■ Even if the plaintiffs had prevailed against Panasonic for breach of contract, they have not presented evidence from which a reasonable jury could find that the International's treatment of grievances was arbitrary, discriminatory or in bad faith. The International has presented a rational reason for its course of conduct. It was faced with a new employer that was willing to accept the International as the exclusive bargaining representative of its workforce if a majority of the workforce had come from Universal. It was also willing accept a new collective bargaining agreement that included the central economic terms of the 1996 Universal CBA but which made some changes to non-economic provisions. If the International had rejected Panasonic's proposal and grieved its refusal to abide by the 1996 Universal CBA, the International could have faced a very unpleasant situation. First, MUMS could have sought its workforce from people that had not worked for Universal immediately before, thus leaving much of the bargaining unit potentially unemployed. MUMS could have contested

the International's right to represent its workforce, thus leading to a dispute over the source of MUMS' employees and whether MUMS had substantial continuity with Universal's manufacturing business and was thus obligated to bargain with the International. If MUMS was found not to have substantial continuity with Universal's manufacturing business, the workforce faced the prospect of holding an election. Finally, as noted in *NLRB v. Burns Int'l Sec. Servs.*, 406 U.S. 272, 285, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972), MUMS could have imposed whatever draconian employment terms and conditions it wanted until the workforce became represented by a union and negotiated a collective bargaining agreement. The International then faced the possibility that it would have to strike during the contract negotiations to get the provisions it wanted. The International's decision to avoid these potential problems was rational. Furthermore, the plaintiffs have not presented any evidence that the International's refusal to grieve MUMS' failure to abide by the 1996 Universal CBA was discriminatory or in bad faith. The fact that its rational choice harmed some employees in the bargaining unit—the returns department employees— while safeguarding employment for a majority of the unit does not render it arbitrary, discriminatory or in bad faith.

In sum, the plaintiffs have pointed to no other evidence that the International was arbitrary, discriminatory or acted in bad faith by not grieving Panasonic's refusal to abide by the 1996 Universal CBA.

### B. *Recommendation to Accept 1996 Universal CBA Terms with Changes*

To the extent that the plaintiffs have pled claims for breach of the duty of fair representation independent of any breach of contract, those claims must also fail. The plaintiffs assert that the International breached its duty of fair representation

when, on May 7, 1999, Behrman recommended that the Local Executive Board authorize her to accept the different non-economic terms that Panasonic wanted to include in a new collective bargaining agreement without finding out what those different terms would be. The plaintiffs also claim that Behrman misled, deceived and withheld material information from the Board when she sought its authority to enter into the 1999 MUMS CBA.

Once again, for the reasons set forth in Part V.A. of this order, the Court finds that the International's conduct, through Behrman, was not arbitrary, discriminatory or in bad faith. At the time Behrman sought approval from the Local Executive Board to enter into the 1999 MUMS CBA, Panasonic had assured her that the economic terms of the 1999 MUMS CBA would be the same as the 1996 Universal CBA. The plaintiffs have not pointed to any evidence that Behrman knew of the proposed new terms on May 7 or pointed out anything that Behrman could have done to force Panasonic to reveal what the non-economic changes were to be. The plaintiffs imply that had she "demanded" to know the changes, Panasonic would have told her. However, it is hardly likely that hardball labor lawyers would have caved in to Behrman's "demand" for more information at that time. Panasonic wanted an answer from the International, and Behrman did her best to get it one and to avoid the numerous potential problems listed in Part V.A. of this order. In light of what she did know at the time, Behrman was straightforward with the Local Executive Board, and, in retrospect, MUMS agreed to essentially what Panasonic said it would agree to in the May 13 letter agreement. The plaintiffs have presented no evidence that Behrman misled, deceived or withheld information from the Local Executive Board. In sum, there is no evidence from which a reasonable jury

could find that her conduct was arbitrary, discriminatory or in bad faith.

## C. *Execution of 1999 MUMS CBA*

The plaintiffs assert that the International breached its duty of fair representation when Behrman executed the 1999 MUMS CBA without disclosing the terms to Local 352 and seeking its ratification of the agreement in violation of Local 352's bylaws. The International argues that its constitution allows it to bargain with employers without input from local unions and entered into collective bargaining agreements without ratification by local unions. In fact, the International's constitution states, in pertinent part, "The General Executive Board, shall also have the power, in cooperation with the Local Union, Joint Board or Council ... to make contracts with employers." Constitution of the International Leather Goods, Plastics, Novelty and Service Workers Union art. VII, § 5.

When it comes to collective bargaining negotiations, it is important to remember that bargaining authority necessarily is "a delegation to the negotiators of a discretion to make such concessions and accept such advantages as, in the light of all relevant considerations, they believe will best serve the interests of the parties represented." *Ford Motor Co. v. Huffman*, 345 U.S. 330, 337–38, 73 S.Ct. 681, 97 L.Ed. 1048 (1953).

In this case, the International's conduct was not arbitrary, discriminatory or in bad faith. It was surely well aware that under *Burns* MUMS could impose any terms it wished on its employees when it opened shop for the first time. Its decision to ensure that the economic benefits remained for the employees who would be working at MUMS was rational. The decision also comported with the International's constitution, although it may not have complied with Local 352's by-laws.

However, a violation relating to ratification of collective bargaining agreements do not by itself constitute a breach of the duty of fair representation. *See, e.g., Brown v. IBEW, Local Union No. 58*, 936 F.2d 251, 255 (6th Cir.1991). The plaintiffs have presented no evidence showing that any ratification deficiency in this case amounts to arbitrary conduct.

The Court is also mindful that it was a perfectly rational decision for the International not to seek ratification from those who did not work for MUMS when the 1999 MUMS CBA was signed, such as the plaintiffs in this case. They could have no interest in a contract with an employer for whom they did not work. The only people who arguably would have the right to ratify the 1999 MUMS CBA are the ones who worked for MUMS when it opened. None of those people is a party to this suit. For this reason, the International could not have breached any duty to the plaintiffs to allow them to ratify the 1999 MUMS CBA.

Finally, the plaintiffs have not presented any evidence that the International's failure to seek ratification of the 1999 MUMS CBA by the Local 352's entire membership was discriminatory or in bad faith.

For the foregoing reasons, the Court finds that the plaintiffs have presented no evidence from which a reasonable jury could find that the International breached its duty of fair representation toward the plaintiffs. Accordingly, the Court will grant the International's motion for summary judgment (Doc. 82).

## VI. Failure to Serve Universal

On August 5, 2002, the Court ordered the plaintiffs to show cause why their claims against Universal should not be dismissed without prejudice pursuant to Federal Rule of Civil Procedure 4(m) for failure to timely effect service in the more than two and a half years since the case

was filed on November 23, 1999. The plaintiffs responded (Doc. 113), not arguing that they had good cause for failure to serve Universal but instead arguing that they *had* served Universal.

In their response, they first argue that the Court was wrong to quash service on August 15, 2000, on another entity with "Universal" in its name. This argument comes about two years too late. The plaintiffs have waived this argument by not asking for reconsideration of the Court's order in a timely fashion.

The plaintiffs then argue that service on Panasonic suffices as service on Universal since they were partners in the formation of MUMS and alter egos. As noted earlier in this order, the plaintiffs have not submitted any evidence from which a reasonable jury could find that Panasonic and Universal were alter egos, and the plaintiffs' complaints in this action are outside the scope of any joint venture it might have had with Panasonic. Furthermore, the plaintiffs have not filed any return of service on Panasonic or attached any return of service to its submissions showing that the summons was directed to a joint venture or partnership as opposed to simply being directed to Panasonic as a corporation. After three years of pursuing this litigation against Panasonic and MUMS but not seeking discovery from Universal or including it in any other way in the progression of this case, the plaintiffs cannot attempt to save their claims against Universal by claiming at the eleventh hour that service was accomplished when it was made upon Panasonic.

Besides the foregoing unsuccessful arguments that they have actually served Universal, the plaintiffs have not even attempted to show good cause for their failure to serve Universal. Thus, Rule 4(m) does not *require* the Court to extend time for service of process. It does, however, *allow* the Court in its discretion to make

such an extension. However, in light of the two-year delinquency in service on Universal and the fact that all other claims in this case have been resolved, such an extension is not warranted and will only serve to reward the plaintiffs' delinquency. Therefore, the Court will dismiss without prejudice the plaintiffs' claims against Universal pursuant to Rule 4(m).

## VII. Conclusion

For the foregoing reasons, the Court hereby:

- **GRANTS** MUMS', Panasonic's and the International's motions for summary judgment (Docs. 62, 70 & 82);
- **DISMISSES without prejudice** the plaintiffs' claims against Universal pursuant to Rule 4(m);
- **DENIES as moot** the plaintiffs' motion to continue subpoenas (Doc. 112); and
- **DIRECTS** the Clerk of Court to enter judgment accordingly.

**IT IS SO ORDERED.**