INTERNATIONAL OIL, CHEMICAL & ATOMIC WORKERS, LOCAL 7–517, and International Oil, Chemical & Atomic Workers, International, AFL–CIO, Plaintiffs–Appellants,

v.

UNO–VEN COMPANY, et al., Defendants–Appellees.

No. 98–2659.

United States Court of Appeals, Seventh Circuit.

Argued Dec. 4, 1998.

Decided March 19, 1999.

**780**

Jeffrey B. Gilbert (argued), Johnson, Jones, Snelling & Gilbert, Chicago, IL, Reuben A. Guttman, Provost & Umphrey, Washington, DC, for Plaintiffs–Appellants.

Columbus R. Gangemi, Jr., Winston & Strawn, Chicago, IL, for Defendant–Appellee Uno–Ven Company.

Jeffrey R. Witham, Dewey Ballantine LLP, Los Angeles, CA, for Defendant–appellee Union Oil Company of California.

Julia A. Martin, Matkov, Salzman, Madoff & Gunn, Chicago, IL, for Defendants–Appellees Petroleos de Venezuelas, SA, PDV America, Incorporated and PDV Midwest Refining, L.L.C.

Paul W. Schroeder, Jones, Day, Reavis & Pogue, Chicago, IL, Stanley Weiner (argued), Jones, Day, Reavis & Pogue, Dallas, TX, for Defendant–Appellee Citgo Petroleum Corporation.

Before POSNER, Chief Judge, and EASTERBROOK and KANNE, Circuit Judges.

POSNER, Chief Judge.

This is a suit by a union (actually an international and one of its locals, but we can ignore that detail) against an employer and others, to enforce a collective bargaining contract. 29 U.S.C. § 185. The suit was dismissed on summary judgment, on the ground that none of the defendants is a party to the contract or otherwise bound by it. There are a couple of subsidiary issues that we take up later, but the principal issue is whether the employer, though not a signatory of the collective bargaining contract, should be bound nevertheless as an agent or successor of the signatory, an affiliate of the employer.

The union signed a collective bargaining contract with Uno–Ven Company covering workers at an oil refinery in Illinois that Uno–Ven owned. Uno–Ven was a 50–50 partnership between VPHI Midwest, Inc. (a wholly owned subsidiary of Venezuela's national petroleum company, PDV) and a wholly owned subsidiary of Unocal. Unocal wanted to get out of the domestic refining business. So it decided to relinquish its interest in the Illinois refinery and, to this end, to dissolve Uno–Ven. On the eve of dissolution, VPHI Midwest transferred its interest in the partnership to PDV Midwest Refining, LLC, another wholly owned subsidiary of PDV. (The parties call PDV Midwest Refining, LLC, "LLC," and we shall follow their usage, though, like "Inc.," the term LLC merely denotes a form of business organization—the limited liability company, similar to a corporation.) After the transfer, Uno–Ven, the partnership, was dissolved, with LLC receiving the Illinois refinery as its share of the partnership assets and the Unocal subsidiary receiving the remaining partnership assets as its share.

LLC, now the sole owner of the refinery, hired another wholly owned subsidiary of PDV, Citgo Petroleum Corporation, to operate it. Citgo hires and fires the workers employed in the refinery, establishes the conditions of their employment, and determines and pays their salaries and fringe benefits. Citgo is thus their "employer" in the ordinary sense of the word, as well as the sense it bears in federal labor law. *NLRB v. E.C.*

*Atkins & Co.,* 331 U.S. 398, 413–14, 67 S.Ct. 1265, 91 L.Ed. 1563 (1947); *NLRB v. International Measurement & Control Co.,* 978 F.2d 334, 340 (7th Cir.1992) ("enterprise with effective direction over labor relations"). But it is not a signatory of the collective bargaining contract.

■ The union's complaint names as defendants all the companies mentioned in the preceding paragraph, even though the only employer of workers represented by the union is Citgo. Although an employer's duty to bargain collectively over terms and conditions of employment ceases when he leaves the business and thus ceases to be the employer of the workers in the bargaining unit, see, e.g., *Pittsburgh & Lake Erie R.R. v. Railway Labor Executives' Ass'n,* 491 U.S. 490, 507, 109 S.Ct. 2584, 105 L.Ed.2d 415 (1989); *Textile Workers Union v. Darlington Mfg. Co.,* 380 U.S. 263, 270–72, 85 S.Ct. 994, 13 L.Ed.2d 827 (1965); *NLRB v. Bell Co.,* 561 F.2d 1264, 1268 (7th Cir.1977); *Railway Labor Executives' Ass'n v. CSX Transportation, Inc.,* 938 F.2d 224, 228 (D.C.Cir.1991); *MT Properties, Inc. v. Transportation–Communications Int'l Union,* 914 F.2d 1083, 1087–90 (8th Cir.1990), he remains bound by the contract, just like any other obligor who decides to go out of business before the contract expires. E.g., *Textile Workers Union v. Darlington Mfg. Co., supra,* 380 U.S. at 271, 85 S.Ct. 994; *Wheelabrator Envirotech Operating Services Inc. v. Massachusetts Laborers District Council Local 1144,* 88 F.3d 40 (1st Cir.1996); *Zady Natey, Inc. v. United Food & Commercial Workers Int'l Union,* 995 F.2d 496, 498–99 (4th Cir.1993). This could be important if the union were seeking damages for breach of the collective bargaining agreement. But it is not. It just wants the workers at the Illinois refinery to be treated in accordance with the terms and conditions of employment set forth in the agreement. In other words, it wants Citgo, the employer of those workers, to comply with the agreement. Whether Citgo must do so is independent of whom else besides Citgo the union has decided to sue.

■ Had Uno–Ven made a bona fide sale of the Illinois refinery to an unaffiliated corporation, call it X, but had not assigned any of the refinery's contracts to X, then X would not be bound by the collective bargaining contract, *NLRB v. Burns Int'l Security Services, Inc.,* 406 U.S. 272, 284–91, 92 S.Ct. 1571, 32 L.Ed.2d 61 (1972); *Howard Johnson Co. v. Detroit Local Joint Executive Board,* 417 U.S. 249, 257, 94 S.Ct. 2236, 41 L.Ed.2d 46 (1974); *New England Mechanical, Inc. v. Laborers Local Union 294,* 909 F.2d 1339, 1342–43 (9th Cir.1990), although it would be required to bargain with the union over a new contract. *NLRB v. Burns Int'l Security Services, Inc., supra,* 406 U.S. at 277–81, 92 S.Ct. 1571; *Canteen Corp. v. NLRB,* 103 F.3d 1355, 1361 (7th Cir.1997). This result—the nonassumption of the seller's liabilities under the collective bargaining contract by the buyer of the assets sold by the seller—would hold even if X, our hypothetical buyer, were wholly owned by Uno–Ven, or if X and Uno–Ven were wholly owned subsidiaries of the same parent corporation. *Esmark, Inc. v. NLRB,* 887 F.2d 739, 759–60 (7th Cir. 1989); *NLRB v. Bell Co., supra,* 561 F.2d at 1268; *Gartner–Harf Co.,* 308 N.L.R.B. 531 (1992). For, consistent both with dicta in *Howard Johnson Co. v. Detroit Local Joint Executive Board, supra,* 417 U.S. at 255–56, 94 S.Ct. 2236, and with the general principle that the law applicable in breach of contract cases under 29 U.S.C. § 185 is federal common law, the parties agree that the federal common law of labor contracts both governs the issue of affiliate liability in this case and follows the general common law policy of respecting the separateness of corporations without regard to common ownership. But this is provided that each corporation complies with the formalities required by corporation law; that the splitting of the overall enterprise into separate corporations does not have an improper purpose, such as to mislead creditors or otherwise avoid contractual obligations or to defeat taxation or regulation; that the unlawful act was not authored by a corporate affiliate, in which event that affiliate as the unlawful actor would be a proper defendant; and that the affiliate did not assume by assignment or otherwise the contractual obligation that the union is suing to enforce. For the general approach, see *Papa v. Katy Industries, Inc.,* 166 F.3d 937 (7th Cir.1999), and for its application in labor

cases see, e.g., *Howard Johnson Co. v. Detroit Local Joint Executive Board, supra,* 417 U.S. at 259 n. 5, 94 S.Ct. 2236; *Trustees of Pension, Welfare & Vacation Fringe Benefit Funds v. Favia Electric Co.,* 995 F.2d 785, 788–89 (7th Cir.1993); *Esmark, Inc. v. NLRB, supra; Lihli Fashions Corp. v. NLRB,* 80 F.3d 743, 748–49 (2d Cir.1996) (per curiam); *New England Mechanical, Inc. v. Laborers Local Union 294, supra,* 909 F.2d at 1343.

We must consider whether this case falls into any of the exceptions to the principle of respecting the formal separateness of affiliated corporations. Suppose that in our hypothetical sale by Uno–Ven of the Illinois refinery to its wholly owned subsidiary it could be shown that Uno–Ven was continuing to manage the labor relations at the refinery. Then Uno–Ven would still be the employer of the refinery's workers in a realistic sense, and X would be bound by the contract as Uno–Ven's agent. *Esmark, Inc. v. NLRB, supra,* 887 F.2d at 755–60. The union cannot succeed with such a theory here, however, because it cannot prove that Uno–Ven or any affiliated entity, except Citgo itself of course, was calling the shots at the refinery after Citgo took charge. Citgo is running things.

The union asks us to consider closely the method by which Uno–Ven was dissolved and the operation of the refinery transferred to Citgo. Had the partnership been dissolved before the formation of LLC, with VPHI Midwest getting the refinery and then selling it to LLC, the chain that the union tries to forge between itself and Uno–Ven would have been broken right there, at the dissolution. The case would then be like our hypothetical case in which X is a wholly owned subsidiary of Uno–Ven and there is no string-pulling. Instead, LLC was brought into the partnership in substitution for VPHI Midwest, and the union points out that under the normal principles of partnership law, each partner is bound by the partnership's contracts. Revised Uniform Partnership Act § 306(a); *Life Care Centers of America, Inc. v. Charles Town Associates Limited Partnership,* 79 F.3d 496, 512 (6th Cir.1996); *Kiewit Eastern Co. v. L & R Construction Co.,* 44 F.3d 1194, 1202 (3d Cir.1995). The union concludes that LLC as a partner in Uno–Ven became bound on Uno–Ven's contract with the union. We think this is right; a partnership and its partners are interchangeable. Revised Uniform Partnership Act § 703(a); *Weiss v. Commissioner,* 956 F.2d 242 (11th Cir.1992); *City of North Kansas City v. Sharp,* 414 F.2d 359, 366 (8th Cir.1969). But if LLC, after the partnership was dissolved and it became the sole owner of the refinery, had then sold the refinery to Citgo, the chain would again have been broken. LLC would no longer have been an employer and so no longer would have been bound by the collective bargaining contract that the union is suing to enforce.

It does not matter that instead of selling the refinery to Citgo, LLC hired Citgo to operate it. The operation that was delegated to Citgo included the management of the refinery's labor. Citgo became the employer of that labor. Nothing in the collective bargaining agreement precluded Uno–Ven or LLC from ceasing to employ the workers at the Illinois refinery. *Pittsburgh & Lake Erie, Darlington,* and the other cases we cited earlier hold that an employer has a right to leave the business, that is, to cease to be an employer, and we cannot see why it should make a difference whether his departure takes the form of a sale, a lease, or an operating agreement. Cf. *NLRB v. Burns Int'l Security Services, Inc., supra,* 406 U.S. at 281–91, 92 S.Ct. 1571; *Alkire v. NLRB,* 716 F.2d 1014 (4th Cir.1983). If, when it signed the collective bargaining agreement with Uno–Ven, the union had worried that Uno–Ven might cease to operate the refinery, it could have included a provision requiring Uno–Ven to assign the contract to any successor. E.g., *Howard Johnson Co. v. Detroit Local Joint Executive Board, supra,* 417 U.S. at 258 n. 3, 94 S.Ct. 2236; *United Mine Workers v. Basin Cooperative Services,* 53 F.3d 222, 223–24 (8th Cir.1995); *In re Chateaugay Corp.,* 891 F.2d 1034, 1037 (2d Cir.1989). Or it could have insisted on a contractual provision forbidding subcontracting and defined "subcontracting" to include what happened here. At argument the union's lawyer pointed us to a provision of the contract that he argued did this. But this

argument does not appear in his opening brief (or his reply brief, for that matter) and is therefore waived. Anyway such contractual provisions do not bind nonsignatory successors, such as Citgo, *Howard Johnson Co. v. Detroit Local Joint Executive Board,* supra, 417 U.S. at 258 n. 3, 94 S.Ct. 2236; *Johnson v. Pullman, Inc.,* 845 F.2d 911, 913 (11th Cir.1988) (per curiam); *Anderson v. Ideal Basic Industries,* 804 F.2d 950, 953 (6th Cir.1986), and while they might enable the union to enjoin the signator from divesting itself of the business, *Howard Johnson Co. v. Detroit Local Joint Executive Board,* supra, 417 U.S. at 258 n. 3, 94 S.Ct. 2236; *Nursing Home & Hospital Union v. Sky Vue Terrace, Inc.,* 759 F.2d 1094 (3d Cir. 1985), no such relief was sought here. The only question here is whether Uno–Ven really divested itself of control over labor relations. There would be little doubt about this were Citgo not an affiliate of LLC, both being owned by PDV. But provided that Citgo is not a sham, alter ego, or cat's paw of LLC (or Uno–Ven, with which, as we have said, LLC is interchangeable under the principles of partnership law), it is entitled to be treated as if it were an independent corporation.

There is evidence that the refinery's labor costs, which were of course influenced by the collective bargaining contract, were a factor in the decision to turn the operation of the refinery over to an entity that would not be bound by the contract. But that is not in itself an improper purpose. Labor costs are a common motive for the sale of a business. Nothing in labor law forbids the sale of a unionized plant to a nonunion employer, though as we mentioned earlier the purchaser will have to bargain collectively with the union.

What would have been improper would be for Uno–Ven to have *pretended* to abandon the operation of the refinery by transferring that operation to a sham entity, a mere marionette. It did not do this. Citgo is a substantial, long-established, asset-rich, bona fide corporation engaged in the oil-refining business. So far as appears, it has full operating control of the refinery, including control over all facets of the refinery's labor

relations. The fact that it is a wholly owned subsidiary of LLC's parent makes it an affiliate of the defunct Uno–Ven by reason of the interchangeability of partnership (Uno–Ven) and partner (LLC), but affiliation does not by itself establish contract liability, either in general law or in labor law. And that is all there is here.

■ We turn to the subsidiary issues. The Worker Adjustment and Retraining Notification Act (WARN), 29 U.S.C. §§ 2101–09, requires 60 days' advance notice, which was not given here, of a "plant closing" or "mass layoff" that results in an "employment loss." §§ 2101(a)(2), (3), 2102(a). "Layoff" and "employment loss" may seem redundant; surely a layoff causes an employment loss to the employees laid off. But this is not always so, and not only because a layoff (as distinct from a termination of the employment relation) must last more than six months to satisfy the Act's definition of "employment loss." § 2101(a)(6)(B). When Citgo took over the Illinois refinery, Uno–Ven notified all the workers that they were no longer employed, because their contract of employment, which is to say the collective bargaining contract, had terminated. But at the same time Citgo offered to hire them all back, at the same wage, with no break in service, though with slightly different fringe benefits and subject to a qualifying test which a handful of them flunked. Of 377 employees who were "fired" effective the date of the transfer of operation to Citgo, 367 were rehired and showed up for work the next day.

A formalistic interpretation would treat the discharge of all 377 by Uno–Ven or LLC as permanent because they were rehired by a different employer (Citgo—and notice how the union here switches sides and argues the separateness of the affiliated entities). But this interpretation is blocked by a provision of the WARN Act that excludes from the definition of "employment loss" the situation here, where the sale of a business results in a technical termination of employment. The provision does this by deeming the employees on the date of the sale employees of the purchaser after the sale. § 2101(b)(1). Thus, unless the purchaser refuses to rehire them

784

or lays them off, there is no "employment loss" and so no duty of advance notice of the "mass layoff." *Wiltz v. M/G Transport Services, Inc.*, 128 F.3d 957, 964–65 (6th Cir. 1997); *Rifkin v. McDonnell Douglas Corp.*, 78 F.3d 1277, 1282 (8th Cir.1996); *International Alliance of Theatrical & Stage Employees v. Compact Video Services, Inc.*, 50 F.3d 1464 (9th Cir.1995); 20 C.F.R. § 639.6. The operating agreement that handed over the running of the plant to Citgo was the equivalent of a sale for purposes of the Act, since it transferred control over the plant's labor relations.

We may assume without having to decide that here as elsewhere the concept of constructive termination, on which see, e.g., *Lindale v. Tokheim Corp.*, 145 F.3d 953, 955 (7th Cir.1998); *Taylor v. FDIC*, 132 F.3d 753, 766 (D.C.Cir.1997), is available to prevent such shenanigans as offering to rehire the workers at a wage so much lower than their previous wage, or on conditions so much inferior, as to rebut an inference of continuity of employment. Obviously not every change in the terms and conditions of work is an "employment loss," *International Alliance of Theatrical & Stage Employees v. Compact Video Services, Inc., supra*, 50 F.3d at 1469, but "employment loss" is defined to include a termination, and termination presumably includes constructive termination. But there is no evidence of that here, with the possible exception of the 10 employees who were not retained—but their layoff was not a "mass layoff" within the meaning of the statute. 29 U.S.C. § 2101(3)(B).

■ Last, there is an issue of privilege. In response to the union's discovery request, Unocal turned over a mass of documents that included some which Unocal later discovered were protected by the attorney-client privilege. It asked for and received a protective order to prevent the union from using any of these documents in the litigation. The union claims that the magistrate judge used the wrong standard in deciding whether to forgive the company's error. The issue is moot in light of our disposition of the appeal, but certain language in the magistrate judge's opinion that Unocal rightly questions prompts us to remind the district courts that

the standard in this circuit governing waivers of privilege through inadvertence is that of *Dellwood Farms, Inc. v. Cargill, Inc.*, 128 F.3d 1122, 1127 (7th Cir.1997).

AFFIRMED.