STATE of Wisconsin, Plaintiff-Respondent,†

v.

T.J. INTERNATIONAL, INC., Defendant-Appellant,

NORCO WINDOWS, INC., Defendant,

JELD-WEN, INC., Defendant-Co-Appellant.

Court of Appeals

*No. 99–2803. Submitted on briefs June 19, 2000.—Decided July 11, 2000.*

## 2000 WI App 181

(Also reported in 617 N.W.2d 256.)

†Petition to review granted.

On behalf of the defendant-appellant, the cause was submitted on the briefs of *Fred G. Groiss* of *Quarles & Brady LLP*, Milwaukee.

On behalf of the defendant-co-appellant, the cause was submitted on the briefs of *Lawrence T. Lynch* of *Foley & Lardner*, Milwaukee.

On behalf of the plaintiff-respondent, the cause was submitted on the brief of *James E. Doyle*, attorney general, and *Jerry L. Hancock*, assistant attorney general.

Before Cane, C.J., Hoover, P.J., and Peterson, J.

¶ 1. PETERSON, J.   This is a review of an original action brought by the State of Wisconsin under the Wisconsin Business Closing and Mass Layoff Law, WIS. STAT. § 109.07[1] (the Act). The Act requires an employer to give sixty days notice of a "business closing," which is

[1] All statutory references are to the 1995–96 edition.

defined in relevant part as a "permanent or temporary shutdown of an employment site" that affects a specified number of employees. WIS. STAT. § 109.07(1)(b). The circuit court entered judgment in favor of the State after it concluded that T.J. International closed its business based in part on the effect the business's sale had on its employees. We reverse because the sale did not result in even a temporary shutdown of the employment site.

BACKGROUND

¶ 2. Windows have been made in Hawkins, Wisconsin, for more than seventy-five years and continue to be made there today. The Hawkins plant is now owned by Jeld-Wen, Inc. Jeld-Wen acquired the business assets on July 1, 1996, from Norco Windows, Inc., a division of T.J. International, Inc. For ease of discussion, we refer to both Norco Windows and T.J. International as Norco.

¶ 3. Norco sent its employees a couple of letters leading up to the business sale. The first was dated April 8, 1996, and explained that Norco intended to sell the plant but that employment was expected to remain steady. On June 7, Norco sent a second letter to its employees to update them on the status of negotiations and how the sale would affect their employment. The letter informed the employees that after the July 1 sale, Norco would no longer be their employer but that they could apply with Jeld-Wen if interested. The letter stated, "Jeld-Wen will make all hiring decisions for its work force, and any failure by Jeld-Wen to hire an associate should be expected to be permanent."

¶ 4. In preparing to take over operations, Jeld-Wen began accepting applications from Norco employees. Jeld-Wen actually hired 343 of the 396 Norco

employees who applied for work before the sale. These employees missed no work, and the State stipulated that "Jeld-Wen continued the operations of the . . . facility without interruption immediately after the asset sale." The State also stipulated that Jeld-Wen eventually hired 349 of Norco's 459 former employees.

¶ 5. In response to the sale preparations, the union president filed an administrative complaint against Norco with the Department of Workforce Development (the department). The complaint alleged a violation of the sixty-day notice requirement under the Act. The department issued an initial determination on July 18, 1997, concluding that the sale constituted a business closing under WIS. STAT. § 109.07(1)(b). The department substantially affirmed that decision in its amended final determination on November 25.

¶ 6. The department's decision found all the defendants liable for violating the Act's notice requirements. When the defendants failed to comply with the decision's mandate, the department referred the case to the Wisconsin Department of Justice (the State). On March 11, 1998, the State filed an action in circuit court against all three defendants. All parties moved for summary judgment,[2] and the circuit court granted the State's motion.

----

[2] Jeld-Wen also moved for dismissal on two jurisdictional issues and again raises those issues on appeal. It argues: (1) it is not a proper party because it was not named in the union's original complaint to the department; and (2) the department failed to refer the case to the State in a timely manner. We are not persuaded by either argument. At the time the union filed its original complaint, Jeld-Wen had not purchased Norco. After the sale Jeld-Wen fully participated in the department's investigations and decision-making process. It has therefore waived

¶ 7. As previously indicated, the principal issue is whether the sale of business assets constituted a business closing when operations continued through the sale. To resolve this issue we must interpret the Act and decide whether the department and circuit court properly concluded that there was a business closing. While we defer to agency interpretations of statutes in certain situations, *see UFE Inc. v. LIRC*, 201 Wis. 2d 274, 284, 548 N.W.2d 57 (1996), the State agrees that we should review this case without deferring to the department's determination. We also review the circuit court's statutory interpretation *de novo. See Stockbridge School Dist. v. DPI*, 202 Wis. 2d 214, 219, 550 N.W.2d 96 (1996).

¶ 8. "The ultimate goal of statutory interpretation is to ascertain legislative intent." *UFE*, 201 Wis. 2d at 281. "The first step of this process is to look at the language of the statute." *Id.* If the plain meaning is clear, a court need not look to rules of statutory construction or other extrinsic aids. *See id.*

¶ 9. WISCONSIN STAT. § 109.07(1m) requires "an employer who has decided upon a business closing or

any argument that it was not an appropriate party to the department's determination. Its second argument is insufficiently developed in that it fails to explain how any of the time limits it cites in WIS. STAT. § 109.07(4) relate to the jurisdictional time the department has to refer a claim to the State. The referenced time limits merely prescribe the minimum time the department must *wait* before referring the claim to the State for further prosecution, *see* § 109.07(4)(b), and the time limit the department of justice has to begin an action after referral, *see* § 109.07(4)(d).

mass layoff in this state" to give notice of that action to, among others, "any affected employe." Section 109.07(1)(b) defines a "business closing" as "a permanent or temporary shutdown of an employment site . . . that affects 25 or more employes . . . ." A "mass layoff," on the other hand, means "a reduction in an employer's work force that is not the result of a business closing that affects . . . [a]t least 25% of the employer's work force or 25 employes, whichever is greater." Section 109.07(1)(f).[3]

¶ 10.   Regardless of an event's affect on employees, however, for a business closing there must first be a "permanent or temporary shutdown of an employment site." WIS. STAT. § 109.07(1)(b). By reference to "an employment site," this definition focuses on what actually occurs at an employment location. The legislature chose language that limits this triggering event from including other events that, although involve no actual stoppage of work, may also significantly affect employees. While a broader definition may have included a sale, under this definition there was no business closing because the employment site did not shut down for any period of time.[4]

---

[3] For our purposes the practical difference between a business closing and a mass layoff is the number of affected employees that satisfies each triggering event's definition. While 25 affected employees is sufficient for a business closing, at least 25% of the employer's workforce must be affected to constitute a mass layoff.

[4] Both Norco and Jeld-Wen cite federal case law as supporting their positions and our conclusion. The federal counterpart of Wisconsin's Act is the Worker Adjustment and Retraining Notification Act (WARN), 29 U.S.C. § 2101 *et seq*. While the department's regulations state that Wisconsin law should be interpreted consistent with federal law to the extent their provi-

¶ 11. The State nevertheless contends that the business closed because Norco effectively terminated all its employees when it sold the business assets. But we reiterate that the triggering event includes more than a test of how many employees are affected.[5] That conclusion is also supported by the definition of an "affected employee," which is "an employe who loses, or may reasonably be expected to lose, his or her employment with an employer who is required to give notice

sions are the same, *see* WIS. ADMIN. CODE § DWD 279.002, we do not rely on federal law for two related reasons. First, WARN contains a "sales exception" not present in Wisconsin's law. Federal courts have relied heavily on this exception in deciding that a business sale is not a WARN event. *See, e.g., Headrick v. Rockwell Int'l Corp.*, 24 F.3d 1272, 1280–81 (10th Cir. 1994).

Second, every cited federal case discusses a sale's effect on employees, not the statutory definition of a business closing. *See, e.g., id.* at 1281 (stating that the sales exception may have been an unnecessary safeguard because "the transfer of employees during a sale [may] not have qualified" under WARN as a "termination").

[5] Disputing this construction, the State cites *International Oil v. Uno-Ven Co.*, 170 F.3d 779, 784 (7th Cir. 1999), for the proposition that Jeld-Wen's reduction of employee benefits means that all the employees were affected under the Act. Setting aside the initial defect of the State's argument that ignores the absence of an employment site shutdown, the Seventh Circuit's analysis does not support the State's contention. *International Oil* indicated that employment termination under WARN includes constructive termination. *See id.* The court's discussion only indicated that "shenanigans" like "offering to rehire the workers at a wage so much lower than their previous wage, or on conditions so much inferior, as to rebut an inference of continuity of employment" could constitute constructive termination and therefore require WARN notice. *Id.* That analysis is inapplicable here.

*. . . because of the business closing or mass layoff."* WIS. STAT. § 109.07(1)(a) (emphasis added).[6]

¶ 12.   The State has expressly stipulated that "Jeld-Wen continued the operations of the . . . facility without interruption immediately after the asset sale." The employment site was never shut down, operations were never suspended and therefore there was no business closing.

¶ 13.   We are also precluded from determining that the asset sale constituted a mass layoff for two reasons. First, the State has never claimed that Norco's sale constituted a mass layoff. Second, Jeld-Wen hired more than 75% of Norco's former employees within six months of the sale. *See* WIS. STAT. § 109.07(1)(f).

██

¶ 14.   The State asks that we consider the primary purpose of the statute, which it contends is to mitigate the economic hardship created by business transactions that impact employees. The State notes that all the employees were affected because they theoretically lost their jobs and had to apply for new ones with Jeld-Wen. We understand that the Act was

---

[6] Although we do not give the department's determination any deference, we note that it relied on WIS. STAT. § 109.07(6)(a). That section provides that an employer is not liable for failing to give notice if the business closing or mass layoff is the result of "[t]he sale of part or all of the employer's business, if the purchaser agrees . . . to hire substantially all of the affected employes with not more than a 6-month break in employment." *Id.* Presumably, the department concluded that the sale of a business always affects employees. That is not how we read the statute. By its express terms, the exception to an employer's liability only applies when a business closing (or mass layoff) has otherwise occurred. Also, because our holding makes it unnecessary, we do not address the defendants' attempt to comply with this section.

enacted for employees' protection, but we cannot rewrite it to require employers to give sixty days' notice for wage adjustments or other modification of employee benefits. The Act creates rights of notification for lost employment from an employment site shutdown or mass layoff. Neither happened here.

*By the Court.*—Judgment reversed.