NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 12a1120n.06

No. 10-1370

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

KENNETH C. SCHREIBER, MARY JANE )
LAMBERT, and GEORGE H. VANTINE )
on behalf of themselves and a similarly )
situated class, )
                            )
       Plaintiffs-Appellants, )
                            )
v. )   ON APPEAL FROM THE UNITED
                            )   STATES DISTRICT COURT FOR THE
PHILIPS DISPLAY COMPONENTS )   EASTERN DISTRICT OF MICHIGAN
COMPANY, PHILIPS ELECTRONICS )
NORTH AMERICA CORPORATION, and )
PHILIPS PACE, )
                            )
       Defendants-Appellees. )

FILED
*Oct 31, 2012*
DEBORAH S. HUNT, Clerk

Before: DAUGHTREY, MOORE, and McKEAGUE, Circuit Judges.

MARTHA CRAIG DAUGHTREY, Circuit Judge. This putative class-action case is before us for the second time, following the remand ordered in *Schreiber v. Philips Display Components Company*, 580 F.3d 355 (6th Cir. 2009). In that appeal, we reviewed the district court's decision dismissing the plaintiffs' claims that the defendants breached both § 301 of the Labor Management Relations Act (LMRA) and their fiduciary duties under the Employee Retirement Income Security Act (ERISA) when they refused to provide lifetime medical insurance coverage for the plaintiffs, their former employees. The district court held that the applicable collective bargaining agreement (CBA) unambiguously failed to

vest retiree healthcare benefits and that the loss of benefits did not implicate the employer's fiduciary duties under ERISA. Our review of the record suggested that relevant portions of the CBA could be seen as ambiguous, and we faulted the district court's failure to consider the summary plan descriptions (SPDs) provided by the employer when parsing the terms of the CBA. The district court had instead treated the SPDs as "extrinsic evidence" unnecessary to its decision, in view of the CBA's "plain language." We also questioned whether the district court had adequately reviewed the plaintiffs' ERISA claim and directed the court to expand its consideration of that claim.

On remand, the district court heard testimony, reviewed the SPDs in question, and again entered judgment in the defendants' favor, finding (1) that there was no evidence of an intent to vest retiree healthcare benefits and, therefore, that the defendants were not obligated to provide lifetime medical insurance coverage; (2) alternatively, that the plaintiffs were not employees of the defendants at the time they retired, but instead were employees of a successor company and, thus, no longer eligible for healthcare benefits formerly provided by Philips Display; and (3) that the ERISA claim was both unsubstantiated and time-barred.[1] We find no reversible error and affirm.

---

[1] "On appeal from a judgment entered following a bench trial, we review the district court's factual findings for clear error and its legal conclusions de novo." *Pressman v. Franklin Nat. Bank*, 384 F.3d 182, 185 (6th Cir. 2004) (citing *Harrison v. Monumental Life Ins. Co.*, 333 F.3d 717, 721-22 (6th Cir.2003)). Although the parties agree that this is the correct standard for our review, they disagree as to whether the district court's findings reflected factual or legal conclusions. Because we hold that the district judge did not err regardless of the standard of review, we need not determine what standard of review applies.

The facts giving rise to the issues in this appeal are set out in detail in our initial decision and need not be restated at great length here. Instead, our main focus at this point is on the additional evidence adduced on remand, including the provisions of various company SPDs and testimony provided at the bench trial in district court.

In summary, the record shows that until 2001, defendant Philips Display Components Company (Philips Display), a division of defendant Philips Electronics North America Corporation (referred to in the record as PENAC) located in Ottawa, Ohio, manufactured cathode ray tubes (CRTs) for television sets. PENAC was headquartered in Ann Arbor and had set up defendant Philips Access Center for Employees (referred to in the record as PACE) as an unincorporated entity to provide administrative services for its various employee benefit plans. In turn, PENAC was a subsidiary of a Dutch company, Koninklijke Philips Electronics, N.V. (referred to in the record by its translated name, Royal Dutch Philips). In 2001, Royal Dutch Philips merged[2] with a Korean competitor, LG Electronics, to form a new company called LG Philips Display Holding, B.V., and relocated its headquarters to Hong Kong. The holding company in turn formed a new subsidiary, LG Philips Displays USA, Inc. (LG Philips), to combine Philips Displays's former television CRT business with LG's manufacture of CRTs for monitors. As part of the changeover,

---

[2]The record refers variously to a "merger," a "joint venture," an "acquisition," and a "sale" in describing the formation of LG Philips Display Holding Company. As a technical matter, it is not clear by what legal means the new entity came into existence. Although the upper management was split evenly between the former executives of the Dutch and Korean companies, the headquarters operation was moved to Hong Kong, apparently because LG Electronics had maintained a strong Asian market, as opposed to the strong European market that Royal Dutch Philips had enjoyed. According to one company executive who testified, the business culture in existence after the merger was "extremely" Korean.

LG Philips assumed the liabilities of the Ottawa plant formerly owned by Philips Display, including the existing CBA. The new company began a separate operation on July 1, 2001, and – as of that date – Philips Display ceased to exist. The record also suggests that LG Electronics paid $330 million for the Ottawa plant.

At the time of the merger and resulting formation of LG Philips, hourly employees at the Ottawa plant worked under a CBA that Philips Display had negotiated with the International Brotherhood of Electrical Workers (the IBEW). It took effect on October 2, 2000, and was set to expire on September 28, 2003. Because the market for CRTs was already beginning to sag prior to the negotiations in 2000, Philips Display let it be known that it planned to close the Ottawa plant, prompting the IBEW to bargain for a more pro-employee retirement system, including a guarantee of vested retiree healthcare benefits that would continue after the plant was shut down. Philips Display repeatedly rejected the union's lifetime-benefits proposal, until the IBEW finally dropped the request. As a result, lifetime healthcare benefits of the kind now claimed by the plaintiffs were not included in the contract, explicitly or by implication, as the district court found in its original opinion. Instead, the provision for medical insurance was limited to those retirees who met the eligibility criteria set out in the SPDs, which, under the CBA, allowed them to "purchase health insurance coverage on the same terms and at the same employee contribution levels as in effect for active employees."

Nor did the SPDs contain language that could be interpreted to create a right to vested healthcare benefits, although the pension plans were, of course, vested. The various insurance plans required that an hourly employee "[b]e eligible for a company sponsored medical plan immediately prior to retirement" in order to qualify for retiree health benefits. The SPDs also provided that coverage would end when an employee left Philips Display, or otherwise became ineligible for benefits, and when the plan was terminated. The SPDs also carried a disclaimer: "The company reserves the right to charge for coverage or to end or amend medical coverage for you or your dependents at any time subject to the provisions of the applicable collective bargaining agreement."

The SPD provisions for salaried employees, most of whom were located in Ann Arbor, carried the same prerequisite, *i.e.*, that a retiring employee be "eligible for a company-sponsored medical plan immediately prior to retirement," and it contained a similar disclaimer: "Although the company presently intends to continue the plan indefinitely, Philips Electronics North American reserves the right to alter any of its provisions, to change the amount of contributions or to terminate all or any part of it, as the company in its sole discretion deems necessary, without prior notice to any covered person."

As compared to the rather impermanent nature of the welfare benefits, the CBA called for "lifetime," "vested," "non-forfeitable" pension benefits to be paid "as long as you live," "at the company's expense." As the defendants now point out, that language

demonstrates that the company and the union knew how to draft language guaranteeing continued benefits, but none of the vesting language appears in either the CBA or the SPD provisions governing welfare benefits. It is thus clear from the record – despite testimony by three or four former Philips Display employees that they "believed" their medical benefits would continue for life[3] – that the district court did not err in concluding that the parties to the 2000 CBA did not intend to provide for vested medical insurance coverage for Philips Display retirees.

The district court also held that the defendants had no obligation to the plaintiffs because, as former employees, they were not eligible for retiree health care benefits under the terms of the SPDs. When the new parent corporation, LG Philips Holding, came into existence on July 1, 2001, the Ottawa plant was conveyed by Royal Philips to LG Philips Holding, and the hourly workers in Ottawa and salaried workers in Ann Arbor became employees of the holding company's new subsidiary, LG Philips. They had been notified of the sale and the impending change in management, and they were also told that the 2000 CBA would remain in place and that LG Philips "would set up the same medical plans" previously provided by Philips Display. As a result, the new LG Philips insurance plans covered Ottawa employees who retired after July 1, 2001, including all the hourly and salaried workers who are plaintiffs in this case. Because they were not "eligible for a

---

[3]This belief undoubtedly stemmed from the fact that Philips Display had continued to carry medical insurance for its retirees long after retirement, even though the company could have "end[ed] or amend[ed] retiree medical coverage at any time" under the terms of the plans. At least one former Philips Display employee who testified at the bench trial was still receiving health care benefits as a result of his retirement prior to July 1, 2001.

Philips sponsored medical plan immediately prior to retirement," as required by the Philips Display SPDs, they were no longer eligible for the retiree benefits formerly provided by Philips Display, although they were covered by the equivalent LG Philips insurance coverage for retirees. Indeed, as the district court found, the plaintiffs – no longer employees of Philips Display after July 1, 2001 – actually retired from LG Philips but were trying to establish eligibility under the Philips Display insurance plans that were no longer applicable to them.[4]

Given the evidence in the record, we conclude that the district court did not err in holding that Philips Display was under no further obligation to provide healthcare benefits to the plaintiffs. In reaching that decision, the district court rejected the plaintiffs' contention that Philips Display was LG Philips's alter ego "in reverse," making Philips Display, as the predecessor company, somehow liable for the obligations undertaken by LG Philips, the successor company. The plaintiffs argued below – and renewed the argument on appeal – "that LG Philips, USA, Inc. (LGP), upon its July 1, 2001 acquisition of the Ottawa facility and Ann Arbor office, acted as an alter ego for the Defendants." They then explained, correctly, that the alter ego doctrine will "bind a new employer that continues the operation

---

[4]As noted above, because of the lack of demand for television CRTs, Philips Display had already announced its intention to shut down the Ottawa plant the year before it was sold to LG Philips and had agreed, as part of the CBA negotiations in 2000, to maintain employment of 800 hourly workers during the term of the new CBA, even if the plant closed. After the sale, LG Philips decided to move their CRT operation to a new factory in Mexico. The Ottawa plant closed in December 2002, but the hourly workers were paid wages and received benefits under the CBA until September 28, 2003. After that date, former Philips Display employees who had retired prior to June 1, 2001, continued to receive their pension and insurance benefits from Philips Display. Those retiring after that date, including the plaintiffs in this case, received pension and insurance benefits through LG Philips – until LG Philips went bankrupt in 2006.

of an old employer in those cases where the new employer is 'merely a disguised continuance of the old employer.'" *NLRB v. Fullerton Transfer & Storage, Ltd.*, 910 F.2d 331, 336 (6th Cir. 1990) (quoting *Southport Petroleum, Co. v. NLRB*, 315 U.S. 100, 106 (1942)). But, it does not follow that the doctrine operates in reverse, *i.e.*, that it will make the *old* employer liable for the obligations of the *new* employer, as the plaintiffs would have us do in this case. They have cited no authority that would require such a result, and we know of none.

Moreover, the district court analyzed the evidence in the record and correctly determined that the LG Philips was not the alter ego of Philips Display, given that the changeover involving those two entities was only a small part of a global transaction that created a new holding company combining some 36,000 employees and over 25 factories. After the changeover, LG Philips moved its operation to Mexico, closed down the offices in Ann Arbor, and no longer manufactured CRTs for televisions. Obviously, LG Philips was not a "disguised continuance" of Philips Display – in short order, the Ottawa plant became more nearly a ghost operation, with some 800 non-working employees collecting pay and benefits and waiting for the existing CBA to expire before retiring. Although it is not clear from the record, we assume that they then received retiree health care benefits from LG Philips until that company declared bankruptcy in 2006, prompting them to seek coverage from their former employer.

The district court also held that the defendants had not breached their fiduciary duties under ERISA. The plaintiffs claimed that PENAC and PACE failed to comply with ERISA procedures in terminating the retirees' heath care benefits as of July 1, 2001. However, the district court found on the merits that the employees had received proper notice and complete information about the termination of Philips Display's insurance coverage and the obligations that LG Philips assumed at the time of the transfer. The court also held that because the plaintiffs had this information in mid-2001, their ERISA claims were time-barred. Those claims were set out in a complaint that was not filed until January 2007. Under ERISA's statute of limitation governing claims for non-fraudulent breach of fiduciary duty, however, an action must be brought within six years after the purported violation or omission or within three years of the date on which a plaintiff had knowledge of the alleged breach, whichever comes first. 29 U.S.C. § 1113. In order to be timely, the claims should have been filed by July 2004 and, therefore, the district court did not err in holding that they were time-barred.

For the reasons set out above, we AFFIRM the judgment of the district court.

*No. 10-1370*
*Schreiber, et al. v. Philips Display Components Company, et al.*

**KAREN NELSON MOORE, Circuit Judge, dissenting in part.** This case presents an opportunity to apply our well established intent-to-vest doctrine in order to determine the key legal issue raised in this appeal: whether the parties intended for retiree health benefits to vest under the collective bargaining agreement ("CBA") entered into between the now-retired employees and the defendants. Unlike many of our prior cases in this area, the operative documents dictating the terms of retirement health benefits were somewhat in flux during the time period when these individuals retired, in the midst of the formation of a joint venture between their employer and an international manufacturer.

When these extraneous facts concerning the joint venture are stripped away, however, it is clear that under our intent-to-vest doctrine, the parties intended for the retiree health benefits to vest under the CBA. The majority's analysis, which results in denying the retirees the benefits to which they are entitled, depends upon these negligible and immaterial inconsistencies arising in conjunction with the joint venture. Under basic contract principles, though, the defendants remain bound as signatories to the CBA and should not be allowed to escape liability as a result of circulating and relying upon ill-constructed documents in conjunction with the joint venture.

Although I disagree with the majority's conclusion on the claims based on breach of contract, I concur on the fiduciary-duty claim. I therefore respectfully dissent in part.

## I. BACKGROUND

Retired employees of LG Philips Displays USA, Inc. ("LG Philips"), along with surviving spouses and dependents (collectively, the "retiree class"), brought a class action against Philips Display Components Company ("Philips Display"), the original employer of the retiree class; Philips Electronics North America Corporation ("PENAC"), the corporation of which Philips Display is a division; and Philips Personal Access Center for Employees ("PACE"), the entity that performed benefits administration for Philips Display and LG Philips. The retiree class is divided into two groups for the purpose of this appeal—those who worked as hourly, unionized employees at an Ottawa, Ohio facility ("hourly retirees") and those who worked as salaried, non-unionized employees in the Philips Display headquarters in Ann Arbor, Michigan ("salaried retirees"). Every member of the retiree class retired on or after July 1, 2001, the date on which PENAC's parent company, Koninklijke Philips Electronics, N.V. ("Royal Dutch"), and LG Electronics formed the joint venture LG Philips Display Holding, B.V., which then created the subsidiary LG Philips. Jt. Ex. 41.

On October 2, 2000, Philips Display and the International Brotherhood of Electrical Workers ("IBEW"), the union representing the hourly employees of Philips Display, entered into a CBA. Jt. Ex. 4. The CBA provided for health benefits for active employees and retirees, and the details of each plan were set forth in summary plan descriptions ("SPDs"). *Id.* at 121–22. The relevant SPDs in this appeal are the Basic/Major Medical Plan and the

Comprehensive Medical Plan. Jt. Exs. 8–9. The Ottawa facility closed on December 31, 2002, and the CBA expired on September 28, 2003. Jt. Ex. 4. Retiree health benefits were provided to the retirees until May 31, 2006, when the defendants terminated the benefits of each class member. Jt. Ex. 22.

Shortly after the termination of retiree health benefits, the hourly and salaried retirees filed an action in federal court seeking damages and declaratory and injunctive relief that would require the defendants to provide retiree health benefits to the retiree class, and to reimburse the retiree class for any costs incurred as a result of defendants' failure to provide such benefits. Specifically, the hourly retirees allege breach of the CBA in contravention of the Labor Management Relations Act ("LMRA") and the Employee Retirement Income Security Act of 1974 ("ERISA"), and the hourly and salaried retirees allege breach of fiduciary duty under ERISA. Because I concur on the fiduciary- duty claim, I will focus this analysis on documents related to the hourly retirees' breach-of-contract claim.

In *Schreiber v. Phillips [sic] Display Components Co. ("Schreiber I")*, No. 07-10246, 2007 WL 3036743 (E.D. Mich. Oct. 16, 2007), the district court granted the defendants' motion for summary judgment on each claim. We then granted the retirees' appeal in *Schreiber v. Philips Display Components Co. ("Schreiber II")*, 580 F.3d 355 (6th Cir. 2009), and remanded the case, directing the district court to consider the SPDs in determining whether the defendants intended to vest benefits. On remand, the district court concluded

that the CBA and the SPDs did not vest lifetime health benefits for any employee who retired on or after July 1, 2001, and that the retiree class was ineligible to receive such benefits, an issue previously unreached. *Schreiber v. Philips Display Components Co. ("Schreiber III")*, 692 F. Supp. 2d 747, 758–61 (E.D. Mich. 2010). Additionally, the district court concluded that the fiduciary-duty claim was time-barred. *Id.* at 761–62.

## II. DEFENDANTS' LIABILITY

A significant preliminary issue in this case is whether the defendants remain liable under the CBA. The retiree class offers two theories under which it argues the defendants are liable. First, the retiree class contends that the defendants are liable under a reverse alter ego theory. The district court agreed with the defendants, however, concluding that the retiree class did not provide sufficient evidence to support use of this theory. *Schreiber III*, 692 F. Supp. 2d at 758. Second, and more importantly, the retiree class argues that as the signatory to the CBA, the defendants remain liable even after purportedly assigning the contract to LG Philips. Appellants Br. at 25. The defendants counter that they ceased being liable under the CBA when they no longer employed the retiree class. Appellees Br. at 31–32. Despite the fact that this theory of liability was pleaded in the retiree class's complaint and raised at all stages of the proceedings below, the district court did not address it in its order resolving the action.

Under established contract principles, the signatory employer remains bound by a CBA even if the employer has assigned the CBA to another employer. RESTATEMENT

(SECOND) OF CONTRACTS § 318(3) (1981) ("Unless the obligee agrees otherwise, neither delegation of performance nor a contract to assume the duty made with the obligor by the person delegated discharges any duty or liability of the delegating obligor."); *see also Adams v. Avondale Indus., Inc.*, 905 F.2d 943, 954 (6th Cir. 1990) (approving the use of § 318(3) in the ERISA context). As stated in Williston on Contracts, "[a]lthough an employer's duty to bargain collectively over the terms and conditions of employment ends if it ceases doing business and thus is no longer the employer of the workers in a particular bargaining unit, it remains bound by the executory terms of any preexisting collective bargaining agreement . . . ." 20 WILLISTON ON CONTRACTS § 55:19 (4th ed.); *see also Int'l Oil, Chem. & Atomic Workers, Local 7-517 v. Uno-Ven Co.*, 170 F.3d 779, 781 (7th Cir. 1999) (same). In other words, an employer remains liable on a CBA unless the contract expressly provides for the discharge of these liabilities or a novation is formed. RESTATEMENT (SECOND) OF CONTRACTS § 318(3), cmt. d ("An obligor is discharged by the substitution of a new obligor only if the contract so provides or if the obligee makes a binding manifestation of assent, forming a novation.").

Applying these principles, I would conclude that the defendants remain bound as signatories to the CBA.[1] There is no evidence in the record of either a discharge of defendants from the CBA or of an assent by LG Philips in the form of a novation. The

---

[1]The majority determined that the district court did not commit any errors, even under a de novo standard of review. I will therefore also employ de novo review of the district court order.

- 14 -

district court thus erred in failing to consider whether the defendants retain liability as signatories to the CBA. Because the defendants retain liability, it is unnecessary to contemplate the applicability of the reverse alter ego theory to this case.

## III. ELIGIBILITY FOR BENEFITS

A second preliminary issue is whether the members of the retiree class, each having retired as an employee of LG Philips, are even eligible under the terms of the CBA to receive retiree health benefits. The CBA provides that "[e]mployees who retire on or after January 1, 1998, who are at least age fifty-five (55) and who meet the terms of the existing plan are entitled to purchase health insurance coverage on the same terms and at the same employee contribution levels as in effect for active employees." Jt. Ex. 4 at 56. The district court interpreted the "existing plan" to be either the Basic/Major Medical Plan or the Comprehensive Medical Plan, whichever is applicable to the individual retiree. *Schreiber III*, 692 F. Supp. 2d at 759. Each of these SPDs explains that an employee is eligible to participate in the Retiree Medical Plan if he or she has a minimum of fifteen years of eligibility service, as defined in the pension plan; begins receiving pension benefits; and is eligible to receive a company-sponsored medical plan prior to retirement. Jt. Ex. 8 at 15; Jt. Ex. 9 at 14. The district court then reasoned that the hourly retirees were not eligible to participate in the Retiree Medical Plan because they were not eligible to receive a medical plan sponsored by PENAC prior to retirement. *Schreiber III*, 692 F. Supp. 2d at 759. This conclusion is based on the district court's determination that the hourly retirees

were no longer employees of Philips at the time of their retirement, and, therefore, were not eligible to receive a medical plan sponsored by PENAC. *Id.* In further support of its position, the district court pointed to language in the SPDs providing that the plan terminates when employees leave the company. *Id.*

The district court's analysis, however, makes unsubstantiated assumptions and disregards critical details in the SPDs. To begin, the district court's analysis is based on the assumption that the term "company" in the phrase "company-sponsored plan" refers to a PENAC-sponsored plan for employees of Philips Display. The district court does not offer any support for this interpretation of the term "company," and there is nothing within the SPDs supporting such a definition. Rather, I would submit that the plain language in the SPDs supports reading the phrase to refer to the company at which the employee is employed prior to his retirement. In addition to being the common-sense reading, the contracting parties chose the term "company" rather than Philips or PENAC, which they opted for in other provisions of the SPDs. *See, e.g.*, Jt. Ex. 8 at 17 ("You will be able to apply the amount of time covered under the Philips Plan towards any pre-existing medical condition exclusion period at another plan . . . ."); Jt. Ex. 9 at 15 (same). Moreover, neither SPD defines the term "company," let alone "company-sponsored plan." If Philips Display had wanted to limit these SPDs to those individuals employed at Philips Display, it knew how to draft such language.

Without this basis, the district court's analysis quickly unravels. If the term "company" describes the company at which the retirees were employed when they retired, as such a general term would seem to indicate, then the retiree class is clearly eligible for retiree benefits. Each of the members of the retiree class was insured prior to retiring as an LG Philips employee, under a plan sponsored at least in part by LG Philips, placing them squarely within the definition of those eligible for a company-sponsored plan. There is no evidence suggesting that LG Philips sponsored any other plan available to the retiree class during this same time period. Given the importance of this term, such an unsubstantiated assumption is a critical flaw in both the district court's and the majority's reasoning.

Even if the term "company" were an explicit reference to Philips Display or PENAC, the retiree class would still remain eligible to receive health benefits. As the record demonstrates, in practice it appears that an employee did not have to be an employee of Philips Display in order to receive a medical plan that PENAC sponsored. In other words, whether the retirees were employees of Philips Display at the time of retirement and whether they were eligible to receive a medical plan sponsored by PENAC are distinct inquiries. There is evidence demonstrating that PENAC and PACE remained closely involved in the administration of the health plans available to the employees that were transferred to LG Philips. Jt. Exs. 12, 17. After July 1, 2001, for example, PENAC remained the Plan Administrator on the plans utilized by the retiree class. Jt. Exs. 41–42.

In fact, the application form required to enroll in a retiree heath benefits plan after July 1, 2001, prominently featured PENAC's name. Jt. Exs. 17, 54.

Moreover, in its Implementation Agreement, LG Philips directed employees planning to retire during certain periods prior to the expiration of the CBA to arrange for pension and health benefits through PACE, which was performing the administrative duties of the plans under a service agreement with LG Philips. Jt. Ex. 12 at 2–3. Under this scheme, PACE evaluated the eligibility of those who applied for retiree health benefits, and when approved, the retirees received these benefits through PACE. *Id.* PACE continued in this role until January 1, 2006. Under these facts, the defendants sponsored the plans by carrying out and administering the retirees' receipt of benefits. Given that PENAC remained an administrative sponsor of the plans, even after the purported transfer of benefits occurred, the retiree class was eligible at the time of retirement for a plan sponsored by PENAC. The district court's conclusion otherwise is error.

Alternatively, if it is accepted that the defendants ceased sponsoring the retiree health plans on July 1, 2001, and that the term "company" specifically references Philips Display or PENAC, the retiree class would not be ineligible for these benefits. As discussed above, the district court's analysis depends heavily on the language in the SPDs requiring the retiree to be eligible for a company-sponsored plan prior to retirement. If the district court were correct, though, in concluding that LG Philips obtained new health plans, albeit ones that mirrored those provided by Philips Display, the language in these new

plans presumably would not include a clause requiring, or interpreted as requiring, LG Philips employees to be employees of Philips Display upon retirement.[2]  In other words, the defendants cannot have it both ways.  They cannot argue that they discontinued the Philips Display plans on July 1, 2001, in an attempt to evade direct liability, yet also rely upon the language in the SPDs for these plans in an attempt to render the retiree class ineligible for benefits.  Appellees Br. at 28, 31.

This contradictory argument presented by the defendants is not only logically untenable, but also based on a vague and confusing paper trail of their own making. Because LG Philips did not provide new SPDs when it purportedly enacted these new plans, there is no language for the retiree class to rely on when making such an argument.[3] LG Philips and the defendants issued documents around the time of the joint venture indicating that LG Philips would establish the same medical plans as those that the

---

[2]This logic similarly applies to the clause in the SPDs terminating coverage when the employee leaves the company.  As employees of LG Philips covered under an LG Philips plan, the retiree class would not have left the company to which the plan refers, and this argument asserted by the defendants would be a nonstarter.  As with the "company-sponsored plan" language, reading this language to refer only to Philips Display is nonsensical.  The majority opinion adds to the confusion by referencing the "leaving the company" provision by stating that the plan terminates when an employee leaves Philips Display.

[3]LG Philips issued its own SPDs in 2005, which is well past the time period relevant to this appeal.  Jt. Exs. 18–19.  The language in these plans is instructive, though, as the eligibility language requires that an employee be eligible for a company-sponsored health-care plan.  The fact that the same language is used in these SPDs, yet references LG Philips rather than Philips Display, lends support to the interpretation that the term "company" is intended to mean the company from which the employee retires.

employees were part of when they were employed by Philips Display. Jt. Ex. 41 at 2. LG Philips also instructed the employees to fill out different claim forms after the joint venture and to use a different plan number. Jt. Ex. 46. Despite these instructions, though, LG Philips never circulated, or perhaps even created, the SPDs for these new plans. This failure by LG Philips and the defendants to effectuate properly the transition of health benefits for these employees vis-a-vis the joint venture should not preclude the retiree class from receiving the benefits to which they are due. Either LG Philips enacted a new plan, under which the language most certainly refers to LG Philips as opposed to PENAC or Philips Display, or the defendants' plan was retained after the joint venture, in which case the retiree class was eligible for a plan sponsored by Philips Display or PENAC.

Under each set of assumptions upon which one could rely in interpreting the ineligibility provision in the SPDs, the analysis results in eligibility for retiree health benefits. I would therefore reverse the district court's determination that the retiree class is ineligible to receive these benefits.

## IV. INTENT TO VEST

Having determined that the retiree class is eligible for retiree health benefits from the defendants, I now turn to whether the defendants intended to vest these as lifetime benefits. "If the parties intend for welfare benefits to vest and the agreement to that effect is breached, there is an ERISA violation as well as an LMRA violation." *Bender v. Newell*

*Window Furnishings, Inc.*, 681 F.3d 253, 261 (6th Cir. 2012).[4] We must first look to the language of the CBA to determine whether the retiree health benefits vested. *See Cole v. Arvinmeritor, Inc.*, 549 F.3d 1064, 1070 (6th Cir. 2008) ("We must first assess the explicit language of the CBAs and apply basic principles of contract interpretation.") (internal quotation marks omitted). If the language in the CBA is ambiguous, we may look to extrinsic evidence in order to discern the intent of the parties. *See Int'l Union, UAW v. BVR Liquidating, Inc.*, 190 F.3d 768, 772 (6th Cir. 1999) ("[A] court should consider extrinsic evidence only when the terms of the contract are ambiguous."); *Cole*, 549 F.3d at 1069 ("A court may find vested rights under a CBA even if the intent to vest has not been explicitly set out in the agreement.") (internal quotation marks omitted). For the reasons stated below, I conclude that the CBA, read in conjunction with the SPD provisions, vested lifetime retiree health benefits.

"[T]he enforcement and interpretation of collective bargaining agreements is governed by traditional rules of contract interpretation so long as their application does not conflict with federal labor policy." *Cincinnati Typographical Union No.3 v. Gannett Satellite Information Network, Inc.*, 17 F.3d 906, 909 (6th Cir. 1994). "Therefore, we might conclude the parties intended a right to vest if we are shown contract language or extrinsic evidence to support that conclusion." *Id.* at 910. Parties may contract to include lifetime benefits in

---

[4] *Schreiber II* aptly summarizes the requisite legal standards for such violations, and there is no need to repeat it here. I will instead focus on the application of our intent-to-vest doctrine in this Section.

a CBA, even if these benefits will outlast the life of the CBA, as "[g]eneral durational provisions only refer to the length of the CBAs and not the period of time contemplated for retiree benefits. Absent specific durational language referring to retiree benefits themselves, courts have held that the general durational language says nothing about those retiree benefits." *Cole*, 549 F.3d at 1071 (internal quotation marks omitted). "[W]hile the retirement package available to someone contemplating retirement will change with the expiration and adoption of CBAs, . . . someone already retired under a particular CBA continues to receive the benefits provided therein despite the expiration of the agreement itself." *Wood v. Detroit Diesel Corp.*, 607 F.3d 427, 433 (6th Cir. 2010) (internal quotation marks omitted) (alterations in original). We have explained that retiree health care benefits vest at retirement "because it would be unfair to allow future agreements between the employer and the union to reduce the pension benefits of retirees when neither the union nor the employer is required to represent those retirees." *Id.* at 434.

After analyzing the CBA and the SPDs, the district court concluded that there was no intent to vest lifetime benefits. It based this determination on the reservation-of-rights clause, a weaker connection to pension benefits than in prior cases, and a lack of explicit language in the CBA vesting lifetime benefits. *Schreiber III*, 692 F. Supp. 2d at 759–61. However, the district court downplays the importance of the relationship between pension eligibility and retiree health insurance benefits. It is well established under our precedent that "language in an agreement that ties eligibility for retiree health benefits to eligibility for a pension indicates an intent to vest the health benefits." *Noe v. PolyOne Corp.*, 520 F.3d

548, 558 (6th Cir. 2008). In fact, when an agreement "ties eligibility for retirement-health benefits to eligibility for a pension . . . there is little room for debate that retirees' health benefits vested upon retirement." *McCoy v. Meridian Auto. Sys., Inc.*, 390 F.3d 417, 422 (6th Cir. 2004). Although the district court only acknowledges one, the SPDs plainly tie two of the three eligibility requirements to an employee's eligibility for a pension. The SPDs explain that in order to receive retiree health benefits, an employee must "[h]ave 15 years of eligibility service, as defined in the company's pension plan . . . [and be] receiving pension benefits or have received a lump sum distribution of the entire pension." Jt. Ex. 8 at 15; Jt. Ex. 9 at 14. It is undisputed that pensions in this case are a lifetime benefit and that they vested for those employees who retired under the CBA.

The district court's attempt at distinguishing this case from our precedent is unpersuasive. Despite a body of case law teaching that when an agreement ties eligibility for retiree benefits to eligibility for a pension the intent is to vest lifetime benefits, the district court once again latches on to a technicality, stating that intent could not be inferred because no prior case had found such an intent when pension eligibility was not the only eligibility requirement. *Schreiber III*, 692 F. Supp. 2d at 760. In essence, the district court takes an established doctrine that dictates finding an intent to vest in this case and muddies it by raising an immaterial and inconsequential distinction. The third requirement, that an employee be eligible for a company-sponsored medical plan prior to retirement, in no way cuts against the intent to vest these benefits and its presence, therefore, does not detract from tying of eligibility to the pension.

Additionally, our case law has developed an inference that parties intend to vest lifetime retiree benefits: "retiree benefits are in a sense 'status' benefits which, as such, carry with them an inference . . . that the parties likely intended those benefits to continue as long as the beneficiary remains a retiree." *Int'l Union,UAW v. Yard-Man, Inc.*, 716 F.2d 1476, 1482 (6th Cir. 1983). This is not a legal presumption, and it does not shift the burden of proof; rather, this inference "simply guide[s] courts faced with the task of discerning the intent of the parties." *Golden v. Kelsey-Hayes Co.*, 73 F.3d 648, 656 (6th Cir. 1996). This inference, coupled with the eligibility requirements, is sufficient to show an intent to vest under our established doctrine.

The district court also attempts to distinguish this case by relying upon the reservation-of-rights clause in the SPDs. In so doing, though, the district court omitted crucial language in the clause. Based on this truncated version of the clause, the district court reasoned that Philips Display could terminate retiree benefits at any time. Specifically, the district court reasoned that "[t]he SPDs clearly reserve the company's 'right to charge for coverage or to end or amend medical coverage . . . at any time . . . .'" *Schreiber III*, 692 F. Supp. 2d at 760 (quoting Jt. Ex. 8 at 17; Jt. Ex. 9 at 16) (alteration in original). The complete reservation-of-rights clause, however, includes a critical limitation: "The company reserves the right to charge for coverage or to end or amend medical coverage for you or your dependents at any time subject to the provisions of the applicable collective bargaining agreement." Jt. Ex. 8 at 17; Jt. Ex. 9 at 16.

Without this limitation to the reservation-of-rights clause, the district court would have correctly construed the intent of the parties, as we have previously held that the inclusion of a standard reservation of rights provision "establishes that there was no intent for benefits to vest." *Int'l Union, UAW v. BVR Liquidating, Inc.*, 190 F.3d 768, 773 (6th Cir. 1999). The plain language of this reservation-of-rights clause, however, limits its ability to terminate coverage by subjecting such an alteration to the provisions of the CBA and casts doubt on the district court's conclusion. The CBA states that "[d]uring the term of this Agreement, the Company shall have the right to amend in any way, the Plans referenced in this Schedule C, except that no such amendment shall diminish the rights prescribed in the Plans as amended by this Agreement . . . ." Jt. Ex. 4 at 121. It is beyond question that terminating all benefits would fall within the prohibition of diminishing the rights provided for in the SPDs. By carefully omitting this language, the district court draws attention to its significance and, therefore, the magnitude of its error.

Under established intent-to-vest principles, the language of the CBA and the relevant provisions of the SPDs vested lifetime retiree health benefits. Therefore, it is unnecessary to consider any additional extrinsic evidence; although "such evidence, had we considered it, weighs heavily in the favor of the plaintiffs and indicates the defendants' intention to provide lifetime retiree healthcare benefits." *Cole*, 549 F.3d at 1075. Moreover, it is important to note that because vesting occurs at the time of retirement, this analysis concerns only those who retired during the life of the CBA. *Wood*, 607 F.3d at

433–34.  After this time, the defendants would not be bound by the provisions of the CBA

to the extent that those provisions had not vested with respect to certain individuals.

## V.  CONCLUSION

For the stated reasons, I would reverse the district court on the claims of breach of

the collective bargaining agreement for those hourly employees who retired prior to the

expiration of the collective bargaining agreement.  I therefore respectfully dissent in part.